## Case No. 15,204.

### UNITED STATES v. GIBERT et al.

[2 Sumn. 19.] [1]

Circuit Court. D. Massachusetts. Oct. Term, 1834.

ROBBERY ON HIGH SEAS—PIRACY—CONTINUANCE—SEPARATE TRIALS—INDICTMENT—CONCLUSION—NEW TRIAL—EVIDENCE.

1. It is not a sufficient ground for a delay of the trial of a capital case, that the party wishes it, in order to procure papers from a foreign country, since this court cannot issue process, which will be effectual in procuring such papers.

2. Convictions for murder may take place, where the murdered body is not found.

[Cited in U. S. v. Matthews, Case No. 15,741a; U. S. v. Williams, Id. 16,707; St. Clair v. U. S., 154 U. S. 152, 14 Sup. Ct. 1009.]

[Cited in brief in State v. Lamb, 28 Mo. 227.]

3. The weight and character of circumstantial evidence.

[Cited in U. S. v. Macomb, Case No. 15,702.]

4. In order to affect all the officers and crew of a piratical vessel with guilt, the original voyage must have been undertaken with a piratical design, and the officers and crew have known and acted upon such design; otherwise those only are guilty, who actively co-operated in the piracy.

[Cited in brief in Com. v. Nicherson, 5 Allen, 525. Cited in State v. Furney, 41 Kan. 115, 21 Pac. 216; State v. Soper, 16 Me. 297.]

5. It would not be sufficient to affect them with guilt, if they had known, that the voyage was intended to be an illegal one, as in the slave trade, contrary to the laws of Spain.

6. The simple fact of presence on board the piratical vessel, where there was no original piratical design, is not sufficient per se to affect a party with the crime.

[Cited in State v. Furney, 41 Kan. 115, 21 Pac. 216.]

7. All, who are present, acting and assisting in the piracy, are to be deemed principals.

8. The prohibition in the constitution of the United States, "Nor shall any person be subject, for the same offence, to be twice put in jeopardy of life or limb," means, that no person shall be tried a second time for the same offence, after a trial by a competent and regular jury, upon a good indictment, whether there be a verdict of acquittal or conviction. Therefore, the circuit court of the United States cannot grant a new trial in a capital case, after a verdict regularly rendered upon a sufficient indictment. Davis, J., dissenting, held that the privilege, intended to be secured by the prohibition, might be waived by the prisoner.

[Cited in U. S. v. Keen, Case No. 15,516; U. S. v. Shoemaker, Id. 16,279; U. S. v. Harding, Id. 15,301; Macy v. De Wolf, Id. 8,933; U. S. v. Holmes, Id. 15,382; U. S. v. Williams, Id. 16,707; Holmes v. Oregon & C. R. Co., 9 Fed. 239; U. S. v. Watkinds, 6 Fed. 159; Sparf v. U. S., 156 U. S. 175, 15 Sup. Ct. 321.]

[Cited in Ex parte Brown, 68 Cal. 180, 8 Pac. 881; Brown v. Swineford, 44 Wis. 287; Harp v. State, 59 Ark. 113, 26 S. W. 715. Disapproved in Re Keenan, 7 Wis. 697. Cited in Kohlheimer v. State, 39 Miss. 548; Re McClaskey (Okl.) 37 Pac. 858; McDonald v. State, 79 Wis. 653, 48 N. W. 864; Mount v. State, 14 Ohio, 295; State v. Davis, 31 W. Va. 393, 7 S. E. 26; State v. Hornsby, 8 Rob. (La.) 583. Disapproved in State v. McCord, 8 Kan. 241; U. S. v. Salter, 1

Pinney, 282; Weinzorpflin v. State. 7 Blatchf. 196. Cited in brief in Williams v. State, 10 Ind. 517.]

9. Quære—If this prohibition extends to the state courts?

10. A new trial may be granted in a capital case, where the jury has been discharged from giving a verdict; for then the party has not been put in jeopardy of his life.

[Distinguished in U. S. v. Keen, Case No. 15,510. Cited in Holmes v. Oregon & C. R. Co., 9 Fed. 239.]

[Cited in Kohlheimer v. State, 39 Miss. 548; State v. Davis, 31 W. Va. 393, 7 S. E. 26; State v. Walker, 26 Ind. 353.]

11. The prohibition in the constitution is a recognition of an old maxim of the common law, and, therefore, we are to resort to the common law to ascertain its true meaning.

[Cited in Kohlheimer v. State, 39 Miss. 548.]

12. There is no instance of a new trial granted by the English courts in capital cases, where the indictment was sufficient, and there has not been a mistrial.

[Cited in State v. Howard, 17 N. H. 197.]

13. Quære—If the courts of the United States may grant new trials in cases of misdemeanors.

[Cited in U. S. v. Morris, Case No. 15,815; Ex parte Lange, 18 Wall. (85 U. S.) 204.]

[Cited in Henning v. State, 106 Ind. 394, 6 N. E. 803, 7 N. E. 4.]

14. Quære—If congress may invest the courts of the United States with the power to grant new trials in all criminal cases, capital or otherwise.

[Cited in U. S. v. Plumer, Case No. 16,056.]

15. A writ of error does not lie at the common law for the refusal of a court to grant a new trial.

[Cited in U. S. v. Jarvis, Case No. 15,469; U. S. v. Plumer, Id. 16,056; Ex parte Lange, 18 Wall. (85 U. S.) 185.]

[Cited in Fay v. Parker, 53 N. H. 387; Welch v. County Court, 29 W. Va. 68, 1 S. E. 340.]

16. According to the constitution of the United States, "no fact, once tried by a jury, shall be otherwise re-examined than according to the rules of the common law;" therefore, independent of the express prohibition of the constitution, there can be no new trial, in a capital case, after a regular trial once had upon a good indictment.

[Cited in Fay v. Parker, 53 N. H. 387; State v. Elden, 41 Me. 169; State v. Lee, 10 R. I. 495. Cited contra in State v. McCord, 8 Kan. 232.]

17. Whether prisoners shall be tried separately or together, rests in the discretion of the court.

[Cited in Ballard v. State (Fla.) 12 South. 868. Cited in brief in Com. v. James, 99 Mass. 439; Doyle v. People, 147 Ill. 395, 35 N. E. 372. Cited in Maton v. People, 15 Ill. 539.]

18. Where the reason assigned for separate trials was, that the prisoners might use the testimony of each other in their defence; held, that this would not justify the court in the exercise of its discretion.

19. Quære—If the court, for the reason assigned, would have a right to grant separate trials, and thus deprive the government of the right to exclude all the confederates from being witnesses, and render them competent, when they would otherwise be incompetent.

20. The clerk of the court, upon the arraignment of the prisoners, did not further proceed, upon their pleading not guilty, to ask them, how they would be tried, so that they did not make the usual reply, "By God and their

country." *Held* that, under the laws of the United States, the plea of not guilty put the prisoners upon the country by a sufficient issue, without any further express words.

[Cited in Com. v. McCormack, 126 Mass. 258; State v. Soper, 16 Me. 300; Territory v. Kee (N. M.) 25 Pac. 926.]

21. A question cannot be put to a witness, the relevancy of which does not appear.

[Cited in brief in Real v. People, 42 N. Y. 275.]

22. Where the court instructed the jury, that certain confessions of the prisoners, reduced to writing, and not produced on the trial, ought to be disregarded by the jury, although they came out upon direct interrogatories of the cross-examining counsel for the defence, *held*, if there was any error in this instruction, it was favorable to the prisoners, and that the suppression of the writings afforded no presumption of law, but of fact only in the case.

23. If the persons, who made the confessions were not identified, but the testimony was only, that some did confess, not being named or identified, such confessions could not be applied to any particular prisoner as proof of his guilt, but might be considered by the jury, so far as they applied to the identification of the piratical vessel.

24. The log-book is not proof per se of the facts therein stated, except in certain cases provided for by statute.

[Cited in Paine v. Maine Mut. Marine Ins. Co., 69 Me. 571.]

25. It was proper to admit parol evidence to establish the time of the sailing of the Panda on her voyage, and to prove the course and termination of the voyage, without proving, that the log-book was missing or lost.

26. The rule, requiring the production of the best evidence, is applied to reject secondary evidence, which leaves that of a higher nature behind in the power of the party: but not to reject one of several eye-witnesses to the same facts, for the testimony of all is in the same degree.

[Cited in U. S. v. Scott, 25 Fed. 471.]

[Cited in Putnam v. Goodall, 31 N. H. 424; State v. Kilgore, 70 Mo. 547.]

27. Where the officers, attending upon the jury, under a mistake of duty, permitted them to read the newspapers,—the officers first inspecting them, and cutting out everything, that in any manner related to the trial,—and it appeared, that in point of fact the jury never saw anything in any newspaper relative to the trial, and, after the charge from the court, were not allowed to see any until they had delivered their verdict, *held*, that it was an irregularity in the officer, but not sufficient to justify the court in setting aside a verdict, and granting a new trial, or treating the matter as a mis-trial.

[Cited in Henning v. State, 106 Ind. 394, 6 N. E. 808, 7 N. E. 4; Jones v. People, 6 Cal. 452; State v. Robinson, 20 W. Va. 757.]

28. Nor would it be sufficient for this purpose, to show, that some of the jurors drank ardent spirits during the trial, when the prisoners' counsel consented in open court to this indulgence to those whose health might require it, unless it was also shown, that the indulgence was grossly abused, and operated injuriously to the prisoners.

[Cited in Creek v. State, 24 Ind. 155; Jones v. People, 6 Cal. 452; Perry v. Bailey, 12 Kan. 546; State v. Greer, 22 W. Va. 827.]

29. The indictment charged the piracy to have been committed "on the high seas, within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state." *Held*, that this was a sufficient statement of the venue, without any further specification of place.

[Cited in St Clair v. U. S., 154 U. S. 145, 14 Sup. Ct. 1006; Kelly v. U. S., 27 Fed. 620.]

30. The crimes act of 1790, c. 9, § 8 [1 Stat. 113], as well as the act of 1820, c. 113 [3 Stat. 600], applies to all murders and robberies committed on board of or upon American ships on the high seas.

31. A conclusion of an indictment against the form of the statute (in the singular) is sufficient in all cases, where the offence is distinctly within more than one independent statute.

32. Also a conclusion against the form of the statutes (in the plural) would be good, even if the offence were punishable by a single statute only.

33. A sworn interpreter may take advantage of the suggestions of others, who are not sworn, with regard to the proper interpretation of testimony, stating the result to the court as his own interpretation.

[Cited in Skaggs v. State, 108 Ind. 56, 8 N. E. 697.]

34. Where the prisoners were placed within the bar, and within a reasonable distance from their counsel, who could constantly have free access to them, and to whom the court stated, that every delay of time for that purpose would be cheerfully given, and it was given, *held*, that to place the prisoners in the very front benches of the bar, by the side of their counsel, would have been an indulgence inconvenient and unnecessary, and that the court did not err, under the circumstances of the case, in refusing it.

35. The court did not err in refusing to have the order of the prisoners (twelve in number) changed, before the introduction of each of the witnesses for the government, who were excluded from the court room, and after the first of these witnesses had been examined and had retired.

36. The witnesses for the government were allowed, with the chart of the Mexican's course before them, to be asked the question, whether, under the circumstances stated of the supposed time of starting of both vessels, the Mexican and Panda would or would not be likely to meet at the point marked on the chart. *Held*, that this was a direct and proper question, and not leading.

37. The practice in this court in capital cases is for counsel to state the points of law, on which they wish instructions to the jury, at some time before the charge is given, that the court may have time to examine and consider them.

38. It would be improper to grant a new trial, on the ground of newly-discovered evidence, proceeding from persons, who were charged as joint offenders with the prisoners, and were incompetent at the time of the trial, but have been acquitted.

[Cited in State v. Bean, 36 N. H. 128.]

39. No bill of exceptions lies in any capital case, in the courts of the United States.

[Cited in State v. Croteau, 23 Vt. 42; State v. Ryan, 120 Mo. 88, 22 S. W. 486, 25 S. W. 354.]

40. The only mode contemplated by the laws of the United States to revise the opinions of the judges of the circuit court in criminal cases is, when the judges are divided in opinion at the trial, and then the point of division may be certified to the supreme court for a final decision under the judicial act of 1802, c. 31, § 6 [2 Stat. 159].

41. No bill of exceptions lies at common law in cases of treason and felony.

42. Quære—If one lies in cases of misdemeanors.

43. If the court has the power in a capital case to allow a bill of exceptions, it is too late to present it, when no tender has been made at the trial, and after the motions for a new trial and in arrest of judgment have been argued and overruled.

Indictment against Pedro Gibert, Bernardo de Soto, Francisco Ruiz, Nicola Costa, Antonio Ferrer, Manuel Boyga, Domingo de Guzman, Juan Antonio Portana, Manuel Castillo, Angel Garcia, Jose Velasquez, Juan Montenegro, otherwise called "Jose Basilio de Castro," part of the officers and crew of the Spanish schooner Panda, for robbery on the high seas, committed on board the American brig Mexican. The brig Mexican belonged to Salem, and was owned by Joseph Peabody. It sailed from Salem for Rio Janeiro on the 29th August, 1832, under the command of Captain Butman; having on board a valuable cargo, and twenty thousand dollars in specie. On the 20th September, in 33° N. lat. and 34° 30′ W. lon., she fell in with a suspicious-looking vessel, from which she made many efforts, but unsuccessfully, to escape. This vessel, a schooner, having come up with the Mexican, fired a gun, and the captain of the latter, seeing that the schooner was armed with one long and two small guns, and that her decks were crowded with men, felt himself obliged to submit, and accordingly hove to. He was then hailed, and ordered to come on board the strange vessel, which mandate he obeyed in his own boat: but on reaching the schooner, five men jumped into the boat, and ordered it to be rowed back to the brig. On arriving on board the brig, they directed the captain to accompany them into the cabin, where, brandishing their knives, threatening and beating him, they compelled him to give up the money which was in his possession. A communication was then made with their companions on board the schooner, who sent a launch and carried away the treasure. The party on board the Mexican then left, after confining the crew below, breaking the compasses, and destroying the rigging and tackle. They also set fire to the caboose, in which they placed a tub of combustibles, and lowered the mainsail in such a way that it would speedily ignite. A short time afterwards, however, the captain contrived to get upon deck, and extinguished the fire before it had caught the mainsail. They then repaired their damages as well as they were able, and returned to Salem, where they arrived on the 2d of October. Information of what had taken place was immediately disseminated throughout this and other countries, and reached the coast of Africa, where Captain Trotter, commanding the British brig of war Curlew, was then cruising. Circumstances led that gentleman to believe that the schooner Panda, then lying in the river Nazareth, was the vessel which had captured the Mexican. He immediately,

therefore, proceeded to take measures against her. These measures resulted in the capture of the Panda, but the escape, for the time, of her crew. No ship's papers or logbook were found on board of her, although diligently sought for; and, owing to some accident, she shortly afterwards blew up, thereby killing several of the Curlew's men. Captain Trotter then sailed to other ports, still making efforts to discover the crew of the Panda, and at last succeeded in arresting the prisoners, and carried them into Portsmouth, England. By the British government, they were sent to this country for trial, the offence of which they were charged having been committed on board a vessel of the United States.[2]

---

[2] Upon the conduct of the British government, and Captain Trotter, the court, in summing up to the jury, remarked as follows:

STORY, Circuit Justice. There was another topic, on which he must say a few words, and that was the remarks, which had been made in relation to the manner, in which the prisoners had been brought here, and upon the circumstances of their capture. He should feel himself unworthy of the station he occupied, if he did not advert to this topic, because, if he rightly understood the prisoners' counsel, an attempt had been made to throw a great deal of doubt over the motives and actions of Captain Trotter, and even of the British government itself, for having sent the case for trial to this country. The British government, on this occasion, finding persons in England in custody of one of its own officers, accused of piracy on an American vessel, chose to send those persons here, where the best evidence could be obtained, and where the greatest facilities and advantages for their trial were to be found. Over piracy, all nations exercise equal jurisdiction, and the British government might justly have exercised it in this case. But they preferred, that the offenders should be tried by the citizens of that country against whom the offence had been committed. And I may say, that this conduct of the British government can scarcely receive too much praise from an American citizen. How could this case have been decided in England? None of the crew of the Mexican, or her owner, were there. How could the evidence heard before this court, and which occupied its attention during the three first days of the trial, have been heard in England? Let us look, too, at the conduct of Captain Trotter. He was an officer of the British navy, stationed on the coast of Africa, with directions to use his exertions in suppressing the slave trade. He was there discharging the particular duty, which had been assigned to him, and was under no obligation to trouble himself about pirates. But he receives information of the robbery of the American brig and that the pirate is supposed to be on the African coast, and immediately goes in quest of her. What motive could this gallant officer have had to interfere in this matter, but a sense of justice, and a desire to protect the rights of the whole world? He had nothing to gain, and he might encounter a great deal of peril, obloquy, and responsibility. Under these circumstances Captain Trotter does interfere. He goes in search of the pirate. And you know, gentlemen, it was no ordinary peril he encountered. Mr. Quentin has stated facts sufficient to prove to you the danger of the undertaking, even when the crew of the Panda were not on board to make resistance. Had the crew remained on board, and used the means in their possession, the loss of lives among the British, they being in open boats, must necessarily have been great. Now what inducement had Captain Trotter to encounter all this, but a

It appeared by the evidence of Jose Perez, one of the crew of the Panda, who had become a witness for the government, that the schooner Panda sailed from Havana on or about the 20th of August, 1832, with Pedro Gibert, master, and Bernardo de Soto, mate, bound for St. Thomas on the coast of Africa, with a cargo of new rum, about thirty bales of cloth, muskets, powder, &c.; that she fell in with the Mexican on the 25th of September, and robbed her of twenty thousand dollars. Of the prisoners, Ruiz, Boyga, Castillo, Garcia and Montenegro were identified as among those who went on board the Mexican, and actively co-operated in the robbery. The trial lasted fifteen days.

The prisoners were defended by George S. Hillard and David L. Child.

A. Dunlap, Dist. Atty., for the United States.

In the course of the trial, many points arose, and were considerably discussed. These appear in the motion for a new trial, which will be found in a subsequent page, and all received the consideration of the court in the full and learned opinion, which was given on that motion.

On the first day of the trial, Child addressed the court, in relation to a motion for the production of the log-book of the Panda, and read an affidavit from the mate of the Panda and others, stating that the log-book was in the possession of certain parties in Portsmouth, England; that the manifestos of the cargo, &c. of the Panda, were also at the Havana, and might be had by sending for them. Time was requested, in order that these necessary documents might be procured.

THE COURT overruled this motion, on the ground that it could not issue process, which would be effective in procuring the papers alluded to; it had no authority in Great Britain, or Havana. It was also stated, by an English officer, who was one of those, who boarded the Panda, that the log-book of that vessel had never been discovered.

The arguments to the jury, were confined very much to a review of the evidence. Hillard, for the prisoners, contended that the Panda had been fitted out for a slaving voyage, for which alone, doubtless many of the crew had shipped; and that if she had robbed the Mexican, only those who had been engaged in the robbery could be punished for it. He cited U. S. v. Jones [Case No. 15,494]; Kidd's Case, 14 How. State Tr. 123.

Before STORY, Circuit Justice, and DAVIS, District Judge.

STORY, Circuit Justice, in summing up the case at the trial, stated as follows. Before I proceed to the facts of the case, it seems proper to take notice of several cases, which have been cited at the bar, to show the danger in capital cases, of relying on presumptive evidence as sufficient proof of guilt. Those cases may be said to constitute the commonplaces of the law, in trials of this sort, always resorted to, to create doubts in the minds of the jury, and to shake our confidence in human testimony. If these cases (some of which, there may be reason to doubt, whether they are founded in truth or in fiction,) are brought to establish any thing, they are brought to establish these propositions on trials on indictments for murder (for they are all of this sort.) (1) That there ought to be no conviction for murder, unless the murdered body is actually found. (2) That men have been convicted of murder upon false testimony. The first proposition certainly cannot be admitted as correct in point of common reason, or of law, unless courts of justice are to establish a positive rule to screen persons from punishment, who may be guilty of the most flagitious crimes. In the cases of murders committed on the high seas, the body is rarely if ever found; and a more complete encouragement and protection for the worst offences of this sort could not be invented, than a rule of this strictness. It would amount to a universal condonation of all murders committed on the high seas. In regard to the second proposition, it is probable, that in some few instances, though they have been rare, innocent persons have been convicted, upon circumstantial evidence, of offences, which they never committed. The same thing has probably sometimes, though perhaps not more rarely, occurred, where the proofs have been positive and direct from witnesses, who have deliberately sworn falsely to the facts, constituting the guilt of the party accused. But to what just conclusion does this tend? Admitting the truth of such cases, are we, then, to abandon all confidence in circumstantial evidence, and in the testimony of witnesses? Are we to declare, that no human testimony to circumstances or to facts, is worthy of belief, or can furnish a just foundation for a conviction? That would be to subvert the whole foundations of the

high sense of public duty, not merely to his own country, but to the commercial world. It is said, that there was something mysterious about the conduct of this brave officer. I have never observed any thing of the kind, gentlemen, during this trial; it remains for you to say, whether any thing of the kind exists. His station was on the African coast, and he could not leave it without orders from home. He made the capture, and communicated it, where he was in duty bound to do, to the heads of the admiralty. We know that he did this, because we find the British government taking cognizance of his act, and sending the prisoners to be tried here with reference to it. Suggestions had been thrown out, and questions asked, as to whether money had not been divided among the crew of the Curlew. This question no person could misunderstand for a moment. Now, I must say, as an individual, that, on the most careful examination, I have found nothing, done by Captain Trotter, that a man in his situation might not fairly do. The learned judge farther stated, in reference to this matter, that if, in this first instance of national reciprocity, British officers found themselves accused without sufficient reason, it would be, as it was the first, most assuredly the last time they would expose themselves to such consequences.

administration of public justice. If, on the other hand, such cases are addressed as a mere admonition to the judgment of the jury, requiring caution on their part in weighing evidence, in order to guard them against the impulses of sudden conclusions and slight suspicions, there is certainly nothing objectionable in the course, although under the solemn circumstances of the present case, it seems hardly necessary to enforce an appeal, the importance of which is so deeply felt by all, who sit on this trial.

I may, indeed, add another remark, which, strange as it may seem, has nevertheless been justified, as there is every reason to believe, by actual facts. It is not even certain, that criminals, who in capital cases plead guilty, and by confession of their guilt in open court, submit to the sentence of the law, are always guilty of the offence. Cases have occurred, in which men have been accused and tried and convicted of murder upon their own solemn confession in a court of justice, where it has been afterwards ascertained, that the party could not have been guilty, for the person supposed to be murdered was found to be still living, or lost his life in another place, and at a different period. And yet it never has been supposed, that a solemn confession in open court, was not a just ground to believe the guilt of the party accused. The truth is, that notwithstanding the admitted infirmity of human testimony, and the inherent defects of circumstantial evidence, they still are, and for ever must be, the only solid foundations, on which reliance can be placed, for the due administration of all civil as well as of all criminal justice. It is scarcely possible to take a step in the trial of any matter of fact, without directly or indirectly appealing to them, as unquestionable and satisfactory sources of human belief.

There are three questions in this case. The first is, whether a robbery was actually committed on the Mexican, on the high seas, as charged in the indictment. The second is, whether it was committed by the officers or crew of the Panda. The third is, whether, if committed by the officers or crew of the Panda, all of them are guilty, or a part only; and if a part, who in particular are guilty. Upon the first question, there is no controversy at the bar. The robbery was committed; and, indeed, is established, if any fact in the case is so, by entirely satisfactory evidence. Upon the second question, it is indispensable to go into a minute and accurate survey of the whole evidence, circumstantial and positive. (Here the judge went into a full examination of all the evidence, leaving all the facts to the jury.) If the jury shall be satisfied that the Mexican was robbed by the Panda, then, upon the third question, there are some principles of law, which require to be accurately considered, in order to arrive at a just conclusion, as to the guilt or innocence of any or all of the parties accused. And, here it is most important to ascertain, whether the original voyage of the Panda from Cuba was intended to be a piratical expedition or not. If it was originally intended to be a piratical expedition, then all of the officers and crew, who knew of such intended expedition, and acted upon it, are to be considered as equally guilty of the robbery of the Mexican, (if the offence was committed,) whether at the moment, they are proved to have been active in the acts then done, or not; for, under such circumstances, they must, in the absence of all counteracting evidence, be presumed to co-operate in furtherance of the original design, each doing the duty assigned to him. If, on the other hand, the original expedition was not intended to be piratical, then those only are to be deemed guilty, who knowingly co-operated in the act of robbery of the Mexican. Co-operation or combination may be express, or it may be implied from circumstances. All, who were present and acting in the robbery, are to be deemed principals. All who were present, advising, directing, encouraging or assisting in the accomplishment of the robbery, thus performing the part assigned to them in the common piratical enterprise, are to be deemed equally principals.♦ But the other persons, whether they were of the officers or of the crew of the Panda, who did not know of the piratical design, and did not co-operate or aid or take any part in it, though they were present on board of the Panda, are not to be deemed guilty. In this view of the matter, the nature of the original enterprise, and of the outfit and voyage of the Panda from Cuba become most material for the consideration of the jury. It is not sufficient to affect all the officers and crew of the Panda with guilt, that they should have known, that the voyage was intended to be an illegal voyage,— as a voyage in the slave trade, contrary to the laws of Spain. The evidence must go farther, and satisfy the jury, that the voyage in contemplation by all of them, was to be piratical, as well as illegal. If the voyage was simply illegal, then those only are to be deemed guilty, who co-operated in the piratical act upon the principles above stated.

Let us now examine the evidence in the case, as applicable to all the persons accused severally, upon the supposition, that the original enterprise, is not shown to be piratical. (Here the judge went into a very minute examination of the evidence, remarking, that if any were guilty of the crime, Gibert, the captain, and De Soto, the owner and mate, must be; for they had the unquestioned command, and control of the ship and crew. He then summed up the evidence, as to the identity of those of the crew of the Panda, who went on board of the Mexican, and as to the acts done by them while on board; and their subsequent conduct and confessions. He added, that against Portana and Guzman, no direct co-operation was proved,

unless the original enterprise was piratical, and so known to be by them; and that the sole evidence against Velasquez, was his assisting in burying the money, as testified to by Perez. In regard to Ferrer, the cook, he remarked, that he was a black man, and possibly might be a slave, and no act was proved against him. If he was a slave, he was entitled to a very indulgent consideration, for he could hardly, under the circumstances, be deemed master of his own will. As to Costa, the cabin boy, he suggested, that there was no evidence against him, and his youth and station ought to induce the jury to give his case a very indulgent consideration. Neither he, nor the cook, were likely to have been entrusted with the secret, that the voyage was originally intended to be piratical, if that was the fact, and no co-operation at the time of the robbery, was shown on their part.)

The jury returned a verdict of not guilty in favor of Ferrer, Costa, Portana, Velasquez, and Guzman, and as to the rest of guilty. After verdict and before judgment, the following motion for a new trial, and in arrest of judgment, was filed by the counsel for the prisoners:

And the said Pedro Gibert, Bernardo de Soto, Francisco Ruiz, Manuel Boyga, Manuel Castillo, Angel Garcia, and Juan Montenegro, prisoners here in the custody of the marshal, after verdict and before judgment, move the court that the said verdict be set aside, and that a new trial be granted, for the causes following, viz.:

I. Because said prisoners, since the rendering of the said verdict, have come to the knowledge, and are enabled to avail themselves, of new evidence, which they believe to be very material for their defence, and that the same, if submitted to a jury, would lead to a result different from the said verdict.

II. Because the said prisoners were not permitted by the honorable court to be tried separately on the indictment in said case.

III. Because the said prisoners were never arraigned upon the said indictment.

IV. Because no issue was joined between the said United States and the said prisoners, according to the course of the common law.

V. Because the said prisoners have never put themselves upon the country of and concerning the matters charged in said indictment, and were never inquired of how they would be tried.

VI. Because the said court overruled a question proposed on the part of the prisoners, to a witness produced by the government, on the ground that the said court could not perceive the object or bearing of the said question, and when the counsel for the said prisoners had stated to the said court that to explain would defeat the object of the said question.

VII. Because the said prisoners believe and respectfully suggest, that in the trial of said cause, the jury were misdirected in matters of law, by the said court, in the following particulars, viz. (1) Because the said court instructed the jury that one Jose Perez, a witness produced on the part of the government, was not an accomplice in the commission of the crime alleged in the said indictment. (2) Because the said court instructed the jury that they might, if they pleased, or they might not, if they pleased, entertain a presumption against the credibility of said Perez, by reason of the refusal of the counsel for the government to produce the written examination of said Perez, taken at Fernando Po; and, because the said court declined giving an instruction that the said refusal of the said counsel, after due notice on the part of the prisoners, to produce the said written examination, afforded a legal presumption, that if the said written examination were brought forward, the effect thereof would be unfavorable to the credit of said Perez. (3) Because the said court instructed the jury that the question of the liability of Henry D. Trotter for the loss and damages occasioned by the capture of the schooner Panda, and by the detention of her officers and crew, was immaterial on the trial of the issue upon the said indictment. (4) Because the said court instructed the jury that certain confessions of the prisoners, testified to have been made at Fernando Po, Sierra Leone, and on the passage of the said prisoners to England, and at other places, were proper to be considered by the jury. (5) Because the said court instructed the jury that the withholding by the counsel for the government from the prisoners on the trial, of certain writings containing the said confessions or a part of them, was a fact from which the jury might presume what they pleased, provided that they presumed nothing therefrom against the prisoners; and because the said court declined to give it in charge to the jury, that the suppression of said writings by the counsel for the government, afforded a legal presumption that if the same were brought forward, the effect thereof would be in favor of the said prisoners. (6) Because the said court declined to instruct the jury that by the waiver on the part of said prisoners of any legal exceptions, to which said writings might be liable, the counsel for the government ought to have put the said writings into the case, or the parole testimony of the same confessions which had been proved to have been reduced to writing, ought to have been wholly rejected and considered out of the case. (7) Because the said court instructed the jury that confessions, testified to have been made by some of the prisoners, without the same having been brought home to any of them individually and by name, might be considered by the jury in reference to the case generally, and to the identification of the said Panda as the pirat-

ical vessel mentioned in said indictment, and of her crew as the piratical crew; and that the jury must not consider such confessions as evidence upon which to convict any one of the prisoners in particular. (8) Because the said court declined to instruct the jury that the counsel for the government having produced a part of the papers and documents appertaining to the said Panda, and not having shown that any of the customary papers and documents, which should regularly be-long to the said Panda, were detained or destroyed by the officers and crew of the said Panda; or were from any cause missing at the time and place of the seizure of those produced—a legal presumption arises that the log-book of the said Panda was taken at the same time and place, and by the same captors, and that they have it or have destroyed it. (9) Because the said court declined to instruct the jury that the non-production of said log-book on the part of the prosecution, gives rise under the circumstances aforesaid, to a legal presumption in favor of the prisoners. (10) Because parol evidence was admitted to prove the time of the sailing of the said Panda on her voyage from Havana to Cape Mount, and to prove the course and termination of said voyage, without evidence having been previously adduced, that the said log-book was missing from said papers and documents at the time and place of said seizure, or had since been casually lost. (11) Because the said court declined to instruct the jury that under the circumstances proved, resistance, flight, or the destroying of the said Panda by her officers and crew, would be exercising the right of self-defence on the part of the said officers and crew. (12) Because the said court declined to instruct the jury that the failure of the government to produce, in evidence of the attempt by said Ruiz to blow up the said Panda, the only witness who saw the match, as applied for that purpose, and who is testified to have removed it, affords a legal presumption against the truth of the alleged attempt by said Ruiz, to destroy the said Panda.

VIII. Because the jury were furnished with newspapers, and did read the said newspapers during the pendency of the trial.

IX. Because the said jury, while they had the said cause in charge, drank ardent spirits.

X. And the said prisoners move for a new trial, because the said verdict is manifestly against evidence and the weight of evidence.

And in case that the honorable court should not set aside the said verdict and grant a new trial, then said Gibert, De Soto, Ruiz, Boyga, Castillo, Garcia and Montenegro, move the court to arrest the judgment on said verdict, for the causes following, viz. (1) Because no legal offence is set forth in said indictment, and because the said indictment is uncertain, insufficient and not judicially intelligible (2) Because the said prisoners were never arraigned, and have never

put themselves upon the country for trial. (3) Because no issue has been joined on said indictment according to the course of the common law.

The foregoing is a copy of the original motion. Subsequent to the filing of that, and before argument. the following additional causes were assigned for a new trial:

Because interpreters were admitted to interpret a part of the testimony of said Jose Perez, without being previously sworn to interpret truly and faithfully. Because the said prisoners were not allowed to be placed near their counsel on the trial, for the purpose of instructing said counsel in the conducting of the defence of said prisoners. when the said counsel had made an application to the said court for said purpose, and stated that in their opinion, such change of position was necessary for said purpose. Because the said court overruled a motion by said counsel, that the order in which said prisoners were placed at the bar on their trial should be changed, before the introduction of each of the witnesses for the government, who were excluded from the court room, after the first of said witnesses had been examined and had retired. Because the counsel for the government was permitted, upon objection made by the counsel for the prisoners, to lead the witnesses for the government, by means of a certain chart, upon which the voyage of the said brig Mexican was delineated, and upon which the point at which the piracy alleged in said indictment had been testified to have been committed, was distinctly marked; and upon a view of said chart by said witnesses, the following question was proposed to them by the said counsel for the government: viz. whether, if the said schooner Panda left the port of Havana on the 20th or 26th of August, bound to Cape Monte, on the coast of Africa, and the said brig Mexican left Salem on the 29th of said August, bound to Rio Janeiro, the said vessels would or would not be likely to meet? Because the said court declared to the jury, and delivered it as the opinion of said court, that the prisoners, by their counsel, had no right to pray instructions to the jury on particular points, after the delivery of the principal charge. Because the said court declined to instruct the jury that if they believed. upon the evidence, that the said schooner Panda, while lying in a certain river called "Nazareth," was suddenly assailed by a superior force, which advanced upon them in hostile array, without hailing or declaring their intention, the officers and crew on board the said Panda, had a right to resist, to flee, or to destroy the said Panda, or to resort to any other means of self-defence, which they might deem expedient.

These motions were argued at great length by George S. Hillard and David L. Child, for the prisoners, and by A. Dunlap, Dist. Atty., for the United States.

THE COURT, in pronouncing its opinion, went so fully into all the considerations urged as to supersede the necessity of stating the arguments, which occupied three days, and were concluded December 10th.

STORY, Circuit Justice. This is an indictment for a robbery on the high sea, which is declared to be a capital offence and piracy by the statute of 1790, c. 9 [1 Stat. 113]. The prisoners having been found guilty, a motion has now been made for a new trial, upon grounds stated in a written motion submitted to the court. Upon the grounds thus stated, it is unnecessary for me to say any more at present, than that so far as they purport to be founded upon what took place at the trial in the presence of the court and jury, they are not admitted by the court, to present a full, accurate, or just representation of all the facts and circumstances. This remark is made simply to prevent any misapprehension from any silence or acquiescence of the court upon this subject.

The question now to be considered is, whether this court has, by the constitution and laws of the United States, authority to grant a new trial in a case circumstanced as the present is. And, in order to free the case as much as possible from any collateral and unimportant considerations, it is proper to state, that in examining this question, we shall, for the present, assume that the court had jurisdiction of the case; that there has been no mis-trial, in a legal sense, that is, no such irregularity, or error in impannelling the jury to try the cause, or in the other proceedings in the course of the trial, as would upon the face of the process and proceedings be fatal as matter of substance, and that the indictment is sufficient in point of law to found a just judgment against the prisoners in conformity to the verdict. In other words, for the purpose of the argument, we shall for the present assume that the jurisdiction is clear, that the indictment is good, and that the trial has been regularly had, and the verdict has been regularly rendered by a competent jury.

Under such circumstances, has this court authority, by the constitution and laws of the United States, to grant a new trial after a verdict regularly rendered of guilty against the prisoners?

The constitution of the United States has exhibited great solicitude on the subject of the trial of crimes, and has declared, that the trial of all crimes, except in cases of impeachment, shall be by jury; and has in some cases prescribed, and in others required congress to prescribe, the place of trial. And certain amendments of the constitution, in the nature of a bill of rights, have been adopted, which fortify and guard this inestimable right of trial by jury. One of these amendments provides that "no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment

of a grand jury," (with certain exceptions not necessary to be mentioned); and it then proceeds—"nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." Now the question is, what is the true interpretation and meaning of this latter clause? When, in a constitutional sense, can a person be said to be twice put in jeopardy of life or limb? If resort should be had to the grammatical structure and meaning of the words, the natural interpretation would certainly seem to be, that no person should be twice put upon trial for any offence, for which he would be liable, upon conviction, to be punished with the loss of life or limb;—for jeopardy means hazard, danger, or peril; and when a party is put upon trial for an offense punishable with the loss of life or limb, and he stands for his deliverance upon the verdict of the jury, he is thereby put in jeopardy, hazard, danger or peril of his life or limb. But, fortunately, in the present case, there is no necessity of resorting to mere general principles of interpretation; for the privilege thus secured is but a constitutional recognition of an old and well established maxim of the common law: and, therefore, we are to resort to the common law to ascertain its true use, interpretation, and limitation. The existence of this maxim as a fundamental rule of the common law in the administration of criminal justice, may be constantly found recognised by elementary writers and courts of justice from a very early period down to the present times. Thus Staundford, in his Pleas of the Crown (lib. 2 c. 36, pp. 105, 106), says—"Home, per common leye, ne mittera sa vie deux foits in jeopardie de trial per un mesme felonie, sinon que sort en ascun especial cas de quel jeo dirra apres." A man shall not by the common law put his life twice in jeopardy of trial for the same felony, except it shall be in some special case, of which I shall hereafter speak. And the excepted case, to which he here alludes, he states in the same chapter to be where there is not in the indictment sufficient matter to constitute felony in point of law. And he applies his doctrine directly to the case of a plea of a former acquittal, grounding the sufficiency of it as a bar upon the above maxim. And he then states, that if the acquittal was upon an insufficient indictment, it is no bar to a second indictment for the same offense (eo que in tiel cas il ne unque mittoit sa vie in jeopardie sur le matter), because his life has never been in jeopardy upon the matter. And the like doctrine may be traced up as early as the age of Bracton. 1 Staund. P. C. lib. 2, c. 36. p. 106. See, also, Fitzh. Abr. Corone, pl. 444. Hawkins, whose work on Crown Law is deservedly held in very high estimation, states the doctrine in the most unqualified manner: "The plea (says he) of autre fois acquit is grounded on this maxim, that a man shall not be brought into danger of his life for one and the same offence more than once.

From whence it is generally taken by all our books, as an undoubted consequence, that where a man is once found not guilty, on an indictment or appeal, free from error, and well commenced before any court, which hath jurisdiction of the cause, he may by the common law, in all cases, plead such acquittal in bar of any subsequent indictment or appeal for the same crime." Hawk. P. C. bk. 2, c. 35, §§ 1, 8–10. And Lord Hale recognizes the same doctrine. See 2 Hale, P. C. 181, 220, 249, 250. See, also, Com. Dig. "Appeal," G. 9, G. 11. And not to multiply authorities on so plain a point, Mr. Justice Blackstone, in his Commentaries (4 Bl. Comm. 335; Reg. v. Carter, 6 Mod. 168), says: "The plea of autre fois acquit. or a former acquittal, is grounded on this universal maxim of the common law of England, that no man is to be brought into jeopardy of his life more than once for the same offence."

Hitherto we have been examining the doctrine with reference to cases of acquittal only. But the like doctrine, founded on the like maxim, will be found to apply to cases of conviction of a capital offence. And, here, in order to avoid any ambiguity, it may be proper to state, that conviction does not mean the judgment passed upon a verdict; "but if the jury find him, (the party), guilty, he is then said to be convicted of the crime, whereof he stands indicted. 4 Bl. Comm. 362; 3 Inst. 131. For there is, in point of law, a difference between the plea of autre fois convict, and autre fois attaint of the same offence; the former may be where there has been no judgment; the latter is founded upon a judgment." See 2 Hawk. P. C. c. 36, §§ 1, 10; Staunf. P. C. lib. 2, c. 37, p. 108; 4 Bl. Comm. 336.

Hawkins, after remarking upon the plea of autre fois attaint, and saying that one reason why it is a good bar for a second prosecution for the same felony is. "because the life of the defendant was in danger by the first; and it is against a maxim of law to bring a man into such danger more than once for the same offence," proceeds to say, "the plea of autre fois convict seems chiefly to depend on this reason, that the party ought not to be twice brought into danger of his life for the same crime." 2 Hawk. P. C. bk. 2, c. 36, §§ 1, 10, 15. He afterwards makes the known exception, where the verdict is erroneous either in respect of insufficiency of the indictment, or for a mis-trial, &c., so that the life of the prisoners was not in danger at the trial. 2 Hawk. P. C. bk. 2, c. 36, § 15. See, also, 2 Hale. P. C. cc. 31, 32, pp. 243, 251; Reg. v. Goddard, 2 Ld. Raym. 922; Armstrong v. Lisle, 1 Salk. 63; People v. Barrett, 1 Johns. 66; People v. Casborus, 13 Johns. 351. See the distinction between a mis-trial, and a new trial in Rex v. Fowler, 4 Barn. & Ald. 273. The same doctrine is abundantly established in the cases of appeals and indictments, reported in 4 Coke, 40–47; and especially in the cases of Richard Vaux and

William Vaux, there stated (pages 40, 44, 45). In the latter case, the court held, "that the reason of autre fois acquit was because, where the maxim of the common law is, that the life of a man shall not be twice put in jeopardy for one and the same offence; and that is the reason and cause why autre fois acquitted or convicted of the same offence is a good plea; yet it is intended of a lawful acquittal or conviction,. for if the conviction or acquittal is not lawful, his life was never in jeopardy; and because the indictment in this case was insufficient, for this reason, he was not legitimo modo acquietatus," &c. "So, if a man be convicted, either by verdict or confession, upon an insufficient indictment, and no judgment thereupon given, he may be again indicted and arraigned, because his life was never in jeopardy, and the law wants its end." And the same was ruled in Wigg's Case, 4 Coke, 45, 47. So in Armstrong v. Lisle. 1 Salk. 63, where there was a plea of autre fois convict to an appeal of murder. the court said: "At common law autre fois convict or acquit was a good bar to an appeal, for no man's life ought to be twice endangered for the same offence." See Smith v. Taylor, 5 Burrows, 2798; Com. Dig. "Appeal," G. 9. And, lastly, Mr. Justice Blackstone, in his Commentaries (4 Bl. Comm. 336), says: "The plea of autre fois convict, or a former conviction of the same identical crime. though no judgment was ever given or perhaps will be (being suspended by the benefit of clergy or other causes), is a good plea in bar to an indictment. And this depends upon the same principle of the former (autre fois acquit) that no man ought to be twice brought in danger of his life for one and the same crime."

Thus we see that the maxim is imbedded in the very elements of the common law; and has been uniformly construed to present an insurmountable barrier to a second prosecution, where there has once been a verdict of acquittal or conviction regularly had upon a sufficient indictment. Indeed, so strong has been the influence of this maxim, that it was for ages construed not only to apply to cases, where there had been a verdict given by a jury; but even where the party had been once put upon his trial before a jury for deliverance. And Lord Coke laid it down, that after a jury were once charged with a prisoner upon an indictment for treason or a felony, the jury could not be discharged, but were bound to give a verdict. 3 Inst. 110; 1 Inst. 227, 6. See, also, Kinloch's Case, Foster, Cr. Law, 28–37; 2 Hawk. P. C. bk. 2, c. 47, § 1. And though that rule has been broken in upon in modern times. and juries have been discharged from giving a verdict in capital cases in cases of pressing necessity; yet it has been done with extreme caution, and confined to cases of pressing necessity; and as we shall presently see, the exercise of it has been greatly doubted, and even denied

in cases where the jury were unable to agree on a verdict.

This matter was very gravely discussed in the Case of the Kinlochs in 1746; and though the court upon that occasion did discharge the jury in favor of life, and so let the prisoners at their request into a new defence; yet the judges did it upon great deliberation and debate. And Sir Michael Foster on this occasion observed (and it illustrates the force of the maxim) that "it was not to bring the prisoners' lives twice in jeopardy, which is one inconvenience of discharging juries in capital cases, but merely in order to give them one chance for their lives, which, it was apprehended, they had lost by pleading to issue." So that even this humane judge felt that it was trenching upon the maxim. and that when once the party was put on his trial before the jury, if the jury were discharged he was subjected to be put twice in jeopardy for the same offence.

Hitherto we have been chiefly considering the case of a new indictment, to which the party pleads the former indictment and a verdict of acquittal or conviction. And it was fit so to do, in order to understand the full import and bearing of the language of the maxim. But the question now more directly presented is, whether the same maxim equally applies to the case of a new trial moved for in a capital case upon the same indictment. It is impossible, I think, to doubt that, in England, the maxim according to the doctrine of the English courts of justice does apply to and govern the case of a new trial. As soon as a capital case is fully committed to a jury, the life of the prisoner is in their hands, and he stands in jeopardy of his life upon the verdict of the jury. He is in the truest sense put upon his deliverance from the peril. When once the verdict is pronounced the case is fixed. If there is a verdict of acquittal, it is generally agreed that he cannot be put upon his trial again for the same offence. And why? Because it contradicts the direct language of this maxim of the common law. He would again be put in jeopardy of his life. And how does the case at all differ in principle in the case of a conviction? The fact is the same. He is again put in jeopardy of his life. He is again to be tried, and acquitted or condemned. If it be said, that it is for his benefit and in favor of his life to have a new trial, that may be true; but there is in the body of the maxim no such qualification or limitation of its meaning. It is nowhere laid down as a part of the maxim that if he is acquitted he shall not be tried again; but if he is convicted he may be allowed a new trial. And if the court are to assume the power in favor of the prisoner; why may it not equally assume it when it will prevent a manifest fraud upon the administration of justice to suffer his acquittal to remain? Cases may easily be put where an acquittal may have been produced by gross bribery of the witnesses, by false testimony fraudulently procured by the prisoner, by spiriting witnesses away, and even by means still more offensive and revolting to public justice. And yet no case has as yet been produced of a new trial granted against a prisoner upon such grounds. In Reg. v. Carter, 6 Mod. 168, Lord Chief Justice Holt stated a case where a rank perjury had gone unpunished from some defect in entering of the record of the former case, in which the perjury was alleged, for that (the first trial for perjury) was final, so as the party could never be tried thereon again. It is true, that in order to avoid difficulties of this sort, the courts in the reign of Charles II. (that reign of bad precedents) did sometimes go so far as to discharge juries before a verdict was given. where there was reason to believe that evidence was suppressed, or that there was not enough to convict the prisoner, or that there was reason to suspect malpractice. And even Lord Hale fell into this erroneous practice, and endeavored to justify it. 2 Hale, P. C. c. 41, pp. 294–296. But it has since been wholly repudiated, and it met the decided disapprobation of Sir Michael Foster. Kinloch's Case, Fost. Cr. Law, 16, 17. But in point of fact, there is no instance of any new trial having been granted by the English courts in capital cases, where the indictment is sufficient, and there has not been a mistrial, upon the plain ground that it would violate the integrity of this fundamental maxim of the common law. Indeed, for a great length of time the opinion prevailed. that there could be no new trial granted in any criminal cases, even where the indictment was for a mere misdemeanor, although it is manifest that the maxim does not apply except to capital felonies. Mr. Justice Blackstone has indeed in his Commentaries said: "In many instances where, contrary to evidence, the jury have found the prisoner guilty, their verdict hath been mercifully set aside, and a new trial granted by the court of king's bench; for in such a case, as hath been said, it cannot be set right by attaint. But there hath as yet been no instance of granting a new trial, where the prisoner was acquitted upon the first." Now, from the other citations already made, it must be manifest that the learned commentator was referring to cases of mere misdemeanors. And he cites in support of this doctrine the case of Rex v. Read, 1 Lev. 9; Rex v. Smith, T. Jones, 163; Rex v. Simons, 10 St. Tr. 416, 19 How. St. Tr. 680; 2 Hawk. P. C. bk. 2, c. 47, § 12; and see Mr. Curwood's note, Id.,—which were all cases of mere misdemeanors. Even as late as this very case of Rex v. Simons, it seems to have been deemed a very unusual course to grant a new trial in any criminal case, where the party was convicted. And in this very case the distinction, as to granting new trials between capital cases and other criminal cases was already recognized; and well it might be, as the maxim applies only to offences

where the party is put in jeopardy of life or limb, which the defendant clearly is not upon an indictment for mere misdemeanors. In Rex v. Mawbey, 6 Term R. 638, Lord Kenyon lays it down expressly that "in one class of offences, indeed, those greater than misdemeanors, no new trial can be granted at all." In a note to the case of Rex v. Inhabitants of Oxford Co., 13 East, 416, note (see 2 Hawk. P. C. bk. 2, c. 47, § 12; and see Mr. Curwood's note, Id.), Mr. East, himself a most able and exact crown lawyer, says: "In capital cases at the assizes, if a conviction take place upon insufficient evidence, the common course is to apply to the crown for a pardon, upon a full report of the evidence sent in by the learned judge to the secretary of state for the home department. But I am not aware of any instance of a new trial, granted in a capital case; and upon the debate of all the judges in Tinckler's·Case in 1781 [1 East, P. C. 354], it seemed to be considered that it could not be." And this is admitted to be the received and settled doctrine in England, by every elementary writer upon the criminal law, who treats of the subject. Thus Mr. Chitty says in his work on Criminal Law. that in case of felony or treason, it seems completely settled that no new trial can in any case be granted. But if the conviction appear to the judge to be improper, he may respite the execution, to enable the defendant to apply for a pardon. 1 Chit. Cr. Law (Eng. Ed.) p. 654; S. P. Christian's note to 3 Bl. Comm. 388. The like doctrine is stated by Mr. Russell, in his work on Crimes. 2 Russ. Cr. bk. 6, c. 1, § 1 (2 Lond. Ed.) p. 589. See, also, 2 Tidd. Prac. p. 820; Rex v. Fowler, 4 Barn. & Ald. 273; Rex v. Edwards, 4 Taunt. 309. And to show how inflexibly the doctrine stands in the jurisprudence of the common law, it may be added that in the report made to parliament by the commissioners on the criminal law, at the very last session, it is stated as a known fact, that parties charged with felonies "cannot have a new trial." Indeed, the total silence of the English books upon this subject during the last three hundred years, is as significant as any positive expression could be. Considering the vast number of capital trials, amounting to hundreds every year, during this long period, the total absence of any trace of a motion for a new trial, in any capital case for misdirection of the court, or upon the discovery of new evidence, or because the verdict was against the weight of evidence, or for any other causes not amounting to a mistrial, where the indictment was good, is perhaps the strongest possible proof, that the power was not supposed to exist in any of the courts.

This then was the actual posture of the common law on this subject, and this the received interpretation of the maxim, at the time when it was solemnly incorporated into the constitution of the United States, as an article of a bill of rights. If this clause does

not in legal contemplation, prohibit the granting a new trial after verdict in a capital case, then there is nothing in the constitution which does prohibit it, even in cases of acquittal. It may be said, that in practice a new trial is never granted in any criminal case after an acquittal. And as a matter of practice, we know that such is the common course. 2 Hawk. P. C. c. 47, § 12; and Curwood's note, 4 Bl. Comm. 361; Rex v. Mann, 4 Maule & S. 337. But in misdemeanors, it is perhaps still open to inquiry, whether the court do not possess the power, if it should choose to exercise it. See 1 Chit. Cr. Law (Lond. Ed.) 657, and cases there cited; Rex v. Reynell, 6 East, 315; Coventry & H. Dig. "Trial," IX., pl. 5, 6; People v. Olcott, 2 Johns. Cas. 301; Fost. Cr. Law, 22–40. At all events, if any clause of the constitution does not prohibit the grant of a new trial after verdict in capital cases, there is nothing to prevent congress from investing the courts of the United States, with the power of granting new trials in all criminal cases (capital or otherwise), as well in cases of acquittal as of conviction, a power which, I imagine, has never hitherto been generally supposed to belong to that body, and which is truly alarming, both in its nature and its exercise.

Let us now see, how the American authorities stand upon the same subject. And here, it is proper to state, that my researches have not enabled me to ascertain a single case, solemnly adjudged in the United States before the adoption of the constitution, in which after a verdict, regularly obtained, a new trial has been granted in a capital case.

In State v. Hopkins (1794), 1 Bay 373 (see also, State v. Duestoe, Id. 377), the prisoner was convicted of passing a ten pound bill, knowing it to have been forged; and he moved for a new trial; and it was granted by the court. There was another count in the indictment for forgery, upon which he was acquitted. It does not distinctly appear upon the face of the report, that the offence was capital, though the argument of counsel would lead us to that conclusion. But no point was made at the argument as to the power of the court to grant a new trial. It was silently taken for granted on all sides. Now, whether the laws of South Carolina, gave such a power to their court in such cases, is what I have no means of knowing. But it is material to state, that the constitution of South Carolina, contains no prohibition on the subject. There is no clause in it, like the prohibitory clause in the constitution of the United States. The point not having been made, the court did not even advert to it.

In U. S. v. Fries [Case No. 5,126], in 1799. which was a trial for treason in the circuit court of the United States for Pennsylvania district, before Judges Iredell and Peters, a new trial was actually granted. This is an authority directly in point, and its bearing cannot be overlooked. But there are circum-

stances in the case, which greatly weaken if they do not impugn its authority. The counsel for the prisoner contended, that though it was not usual, to grant a new trial in a capital case, it was unquestionably in the power of the court so to do; and for this they cited 4 Bl. Comm. 391 (probably intending page 361); 1 Burrows, 394; 2 Strange, 968; and 6 Coke, 14. Now, it will be found, upon examination, that not a single one of these citations justifies the doctrine contended for. The citation from Blackstone (page 391, if the page be not miscited) contains not one word on the subject. If page 361 was intended, the doctrine (as we have already seen) applies only to misdemeanors. The case in 1 Burrows, 394, was a civil suit, and in which, Lord Mansfield discussed the right to grant new trials, with reference to such suits only. The case in 6 Coke, 14 (Arundel's Case), was upon a motion in arrest of judgment, because there was a mis-trial, the jury having in that case (murder) been drawn, not out of the parish, but from the vicinage of the city, or as it is phrased, that the venue ought to have been out of the parish, and not out of the city. And the court adjudged that "the trial was insufficient, and a new venire facias was awarded to try the issue again, for his (the prisoner's) life was never in jeopardy." This therefore was not a motion for a new trial, grounded upon matters, dehors the record, but for matters of error on the face of the proceedings, showing that there had been a mis-trial, or no lawful trial at all; in other words, not by lawful jurors. In Rex v. Gibson, 2 Strange, 968, the defendant was indicted for forgery (of what sort is not stated), and would have moved for a new trial (for what cause is not stated) without appearing in court; and the court refused to hear the motion, on account of his not being present. The same case is reported in 7 Mod. 205, where it is stated to be the forgery of a note, and it must have been a forgery at the common law, which was only a misdemeanor; for it appears that the offence, was charged in the indictment to have been committed in 1713; and it was not until the statute of 2 Geo. II. c. 25 (1729), that forgery of a note was made a capital offence. 4 Bl. Comm. 249. In Fries's Case, the counsel for the government, admitted the power of the court, to grant a new trial in capital cases, and argued solely against the validity of the grounds assigned for granting it in that case. The point was therefore not argued; the clause in the constitution of the United States was not even alluded to, much less reasoned out. The court did not, in giving their judgment, in any manner speak to the point, and the judges were divided in opinion, as to the propriety of granting a new trial, for the cause shown; but Judge Peters yielded his opinion, and acquiesced in granting the new trial. Now, under such circumstances, it is not too much to say, that the court might have been surprised into the de-

cision; and certainly in a case of constitutional law, it ought to have no decisive influence, especially (as we shall presently see) that in the very state of Pennsylvania, in whose constitution a like clause exists, and where this cause was tried, the power has been solemnly denied to exist under stronger circumstances.

In Com. v. Hardy (1807) 2 Mass. 303, the supreme court of Massachusetts granted a new trial, in a capital case, because there had been a mis-trial, the prisoner having been arraigned before an incompetent tribunal, and therefore in legal interpretation, the trial was utterly void, as coram non judice. No one can doubt the propriety of this decision. But it stands wide of the present question.

In Com. v. Green, 17 Mass. 515, the very point of the right of the supreme court of Massachusetts, to grant a new trial in capital cases, after verdict, was brought before the court, and argued at large; and the decision was in favor of the power; but the new trial was denied upon the merits. In delivering the opinion of the court, Mr. Chief Justice Parker said: "It appears by the English text books, and by several decisions cited in support of the position, that in cases of felony a new trial is not usually allowed by the courts of that country. But whatever reasons may exist in that country for this practice, we are unable to discern any sufficient ground for adopting it here." Now, with the greatest deference for that learned judge, I cannot admit, that this language truly represents the state of the English common law doctrine on this subject. On the contrary, as I understand that doctrine, it is no matter of practice at all (usual or unusual), in respect to which the English courts are at liberty to exercise any discretion; but it is a matter of power, which a fundamental maxim of the common law prohibits the court from exercising, in all cases (subject to the exceptions already adverted to); and which disability, nothing but an act of parliament can remove. It is a matter of right of every British subject, which constitutes a part of his freedom, like other great rights secured by Magna Charta. If it were a matter of mere practice, there might be some ground for an American court to adopt or reject it. But if it is a great common law right, then it stands upon a very different foundation. The learned judge goes into a train of reasoning to show, why in cases of acquittal, no new trial should be granted, in relation to those, whose lives have been once put in jeopardy; and also, to show that in cases of conviction, the same reasons for denying a new trial, do not apply. But I cannot find that he anywhere denies, that if a new trial is granted in a case of conviction, the party is put a second time, in jeopardy of his life. But it is no part of my right or duty, to enter upon the examination of the reasoning of the learned judge in that case.

First, because, in the constitution of Massachusetts, there is no clause similar to that contained in the constitution of the United States; and it is for the supreme court of the state, and not for me to decide what portion of the common law is in force therein. And secondly, because the supreme court of the state, is the appropriate and exclusive judge of its own powers under the constitution and laws of the state; and it may well be, that it has complete power to grant new trials in capital cases, when no such power exists in the courts of the United States. If this were not (as I think it is) a question of constitutional law, under the constitution of the United States, but under the laws of the United States, I can read in the judiciary act of 1789, c. 20, § 17 [1 Stat. 83], that the courts of the United States have not a universal power to grant new trials, but only "power to grant new trials in cases where there has been a trial by jury, for reasons for which new trials have been usually granted in courts of law." As far as the reasoning of the learned judge goes, it may show that it may be of great public utility, to have the power to grant new trials, in cases of capital convictions, and not in cases of capital acquittals. But this reasoning must address itself to the framers of the constitution, and not to those who are called upon to administer its actual provisions.

A case has also been cited from Virginia (Com. v. Jones, 1 Leigh. 598), where a motion for a new trial was entertained by the appellate court in a capital case after a conviction; and upon the merits was denied. But to this case as an authority bearing on the present question, two objections may be properly made; first, that the point was not made at the argument, nor considered by the court; and secondly, that the constitution of Virginia contains no prohibitory clause bearing upon the point; and consequently the right to entertain such a motion was dependent wholly upon the local jurisprudence; and whether it was conferred upon the court was matter of local law, turning upon no general principles.

Another case has been cited from the Indiana Reports (Jerry v. State, 1 Blackf. 395), in which a writ of error was brought in a capital case from a judgment of an inferior court, refusing to grant a new trial to the prisoner after a conviction, which was moved for upon the ground that the verdict was contrary to evidence. The supreme court of the state ordered the judgment of the court below to be reversed, and the verdict set aside, and a new trial granted upon the ground that strong doubts remained, whether the testimony supported the verdict. Upon this case it may in the first place be remarked, that a writ of error for the refusal of a court to grant a new trial does not lie at the common law; and so it has been repeatedly held in the supreme court of the United States, the granting of such new trial in any case being

a matter of discretion. So that the case must stand upon some peculiarity of the local jurisprudence. And in the next place, though the constitution of Indiana does contain a prohibitory clause, like that in the constitution of the United States, it is not even alluded to in the opinion of the court, short and unsatisfactory as it is; and therefore we cannot know whether the point has ever been argued in that state, or not. Under such circumstances the case can have no intrinsic authority here.

In no one of the cases heretofore cited has the clause of the constitution of the United States been brought under the review of the court, or its interpretation ascertained. But there are cases in other courts of great respectability in which the question has come solemnly in judgment; and the true intent and meaning of the clause has been severely sifted. If I do not greatly mistake, some of these cases will be found to carry an opposite doctrine far beyond the limits necessary for the decision of the present case. One of these cases is People v. Goodwin (1820) 18 Johns. 187, where the whole subject was most elaborately examined by the counsel and the court. It was an indictment for manslaughter, and the jury, after the whole cause was heard, being unable to agree, were discharged by the court without the consent of the defendant. The question was, whether under these circumstances the defendant could be again put upon his trial. On the part of the defendant it was contended that he could not, among other reasons, because the constitution of the United States had declared, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb;" and that putting the party upon trial was putting him in jeopardy of life and limb. The argument on the other side was, that this clause did not apply to state courts; and if it did, it was inapplicable to the cause, for if the cause was sent to another jury, the defendant would not be twice in jeopardy, nor twice tried, for there never had been a trial, in which the merits had been decided on. The court inclined to the opinion that the clause was operative upon the state courts; but at all events that it was a sound and fundamental principle of the common law, that the true meaning of the clause was that no man shall be twice tried for the same offence; that the true test by which to decide the point, whether tried or not, is by the plea of autre fois acquit, or autre fois convict; and, finally, (what is more direct to the present purpose,) that in a legal sense "a defendant is not once put in jeopardy until the verdict is rendered for or against him, and if for or against him he can never be drawn in question again for the same offence." And the court accordingly held that the discharge of the jury before giving a verdict was no bar to another trial of the defendant. Soon afterwards (in 1822) the same question occurred in Pennsylvania, before the supreme court of

that state, in the case of Com. v. Cook, 6 Serg. & R. 577; and what makes it still more direct, as an authority, there is a provision in the state constitution of Pennsylvania exactly like that in the constitution of the United States. The court held that the discharge of the jury, because they could not agree, was unlawful, and was not a case of necessity within the meaning of the rule on the subject. Mr. Chief Justice Tilghman on that occasion said, where a party "is tried and acquitted on a bad indictment, he may be tried again, because his life was not in jeopardy. The court could not have given judgment against him, if he had been convicted. But where the indictment is good, and the jury are charged with the prisoner, his life is undoubtedly in jeopardy during their deliberation." "I grant that in case of necessity they (the jury) may be discharged; but if there be any thing short of absolute necessity, how can the court, without violating the constitution, take from the prisoner his right to have the jury kept together until they have agreed, so that he may not be put in jeopardy a second time?" So that the opinion of the learned chief justice, á fortiori, manifestly is, that if a verdict has been once regularly given upon a good indictment, the prisoner could not be tried again. Mr. Justice Duncan was still more full upon the point. After adverting to the case of People v. Goodwin, and the construction there given to the clause now under consideration, he said, "I feel a strong conviction that the construction here (there) given to this provision of the constitution of the United States, engrafted into the constitutions of Delaware, Kentucky, and Tennessee, and made an article in the bill of rights of this state, is not the true one, and that the provision that no person can be put twice in jeopardy of life and limb, means something more than that he shall not be twice tried for the same offence. It is borrowed from the common law; and a solemn construction it had received in the courts of common law ought to be given to it," &c. "This is not the signification of the words used in their common use nor in their grammatical or legal sense. 'Twice put in jeopardy,' and 'twice put on trial,' convey to the plainest understanding different ideas," &c. "There is a wide difference between a verdict given and jeopardy of a verdict. Hazard, peril, danger of a verdict, cannot mean a verdict given. Whenever the jury are charged with a prisoner, where the offence is punishable by death, and the indictment is not defective, he is in jeopardy of life." And he accordingly held, that in that case the jury, having been discharged, without giving any verdict, for an unjustifiable cause and without necessity, the prisoner was not liable to be tried again. And here I might repeat, á fortiori, if the jury had given a verdict he could not be tried again.

The same question came before the supreme court of North Carolina in State v. Garrigues, 1 Hayw. (N. C.) 241, and very recently again (in 1828, in Re Spier, 1 Dev. 491) before the same court, where the jury in a capital case had been discharged without legal necessity and had given no verdict. The court held that the prisoner could not be again tried. Upon this occasion the cases in the supreme courts of Massachusetts, New York, and Pennsylvania were cited, and the court adopted that of the supreme court of Pennsylvania, and affirmed the exposition of the clause given by that court, that no man shall be twice put in jeopardy, &c. for the same offence. Mr. Justice Hall said: "When the jury were thus charged with the prisoner he certainly stood upon his trial; his life was jeopardized;" and he afterwards proceeded to the exceptions of a discharge from necessity, and when the indictment is bad. Mr. Chief Justice Taylor delivered a more elaborate opinion, insisting that "twice put in jeopardy," and "twice put on trial," convey to the mind several and distinct meanings; for we can readily understand how a person has been in jeopardy, upon whose case the jury have not passed. The danger and peril of a verdict do not relate to a verdict given. When the jury are impannelled upon the trial of a person for a capital offence, and the indictment is not defective, his life is in peril or jeopardy, and continues so throughout the trial.

Now, whatever diversity of opinion there may be among these learned judges as to the right and power of the court to discharge the jury in a capital case from giving any verdict, except in cases of extreme necessity, all of them agree in this, that after a verdict once given by the jury in a capital case, upon a good indictment, the party cannot be again tried for the same offence; and that such an attempt would be a violation of the constitution of the United States. The judges in Pennsylvania and North Carolina go farther, and deem the case within the prohibition of the constitution, if the party is once put upon trial before a jury, and the jury is discharged without giving a verdict, except in cases of extreme necessity.

Upon the question of discharging a jury in capital cases, the supreme court of the United States have in the case of U. S. v. Perez, 9 Wheat. [22 U. S.] 579, adopted the doctrine of the supreme court of New York. Upon that occasion the court did not go into any exposition of the clause in the constitution now under consideration; but simply stated that in the case of Perez, the prisoner had not been convicted or acquitted, and therefore might again be put upon his defence. But I think I may say, that it was never for a moment at that time understood by the court, that if there had been a verdict of conviction or acquittal, the prisoner could be again tried for the same offence. The point was not before the court, and was not at all examined.

In the very recent case of People v. Comstock, 8 Wend. 549, the supreme court of New York treated it as perfectly certain and settled "that in offences greater than misde-

meanors, a new trial cannot be granted on the merits, even where the prisoner has been convicted;" and the court placed the doctrine upon the same basis on which the English cases already cited have put it. I am not unaware that there is some general language attributed to the court in People v. Stone, 5 Wend. 39, which may bear a different interpretation. But it was a mere obiter dictum, and stands overruled by the later and more exactly considered cases.

Now, in the face of these authorities bearing directly on the point, and in which the interpretation of the clause of the constitution was before the court, I confess myself greatly distressed in attempting to give a different interpretation, without reducing the words to an unmeaning formulary, vox et præterea nihil. I find that my brother, the late Mr. Justice WASHINGTON, in the case of U. S. v. Haskell [Case No. 15,321], where a jury had been discharged in a capital case, before verdict, on account of the insanity of one of the jurymen, held that there might be a new trial; and that the discharge was no bar to a further prosecution—upon that occasion, he said that the jeopardy spoken of in this article can be interpreted to mean nothing short of the acquittal or conviction of the prisoner, and the judgment of the court thereon. And he asserted this to be the meaning affixed to the expression of the common law. Upon this I should greatly doubt as a doctrine universally true, especially when I find that it differs from the doctrine maintained by Mr. Justice Blackstone in his Commentaries (4 Comm. 336), as well as in some other authorities (see, on this subject, Vaux's Case, 4 Coke, 44, 45; Wigg's Case, Id. 45, 46; 2 Hawk. P. C. c. 36, §§ 13. 14, 19. But see 2 Hale, P. C. c. 32, p. 251; Id. c. 55, p. 391; Id., c. 31, p. 243); for, then, there would be no distinction between the plea of autre fois convict and the plea of autre fois attaint, of the same offence; and yet a distinction is manifestly maintained between them. And if it were even true that the plea of autre fois acquit or autre fois convict without a judgment, could not be pleaded technically as a bar to another prosecution or another indictment, it would not follow that it might not be a good bar to a new trial upon the same indictment, when there had already been one trial regularly had upon the ground of the maxim already adverted to; for upon the first trial the life of the prisoner was certainly in jeopardy. Mr. Justice Washington afterwards says, that the article does not apply to a jeopardy short of a conviction; which may be true, if we are to understand by conviction (as is certainly the legal sense), a verdict against or confession by the party of record. See 4 Bl. Comm. 362; 4 Coke, 46; 2 Hawk. P. C. c. 36, § 9; 1 Chit. Cr. Law (2 Lond. Ed.) 462. But what with me is decisive against the construction of the

clause of the constitution given by Mr. Justice Washington is, that he puts it as clear upon his interpretation, that after a verdict of acquittal in a capital case (upon a good indictment) the court might still award a new trial against the prisoner. And he puts the case (to illustrate this doctrine) of an acquittal of the prisoner procured by his own fraud. Now, I am not aware that the maxim has ever received such an interpretation from any other judge; and all the authorities which I have seen are against it. I confess my extreme repugnance to adopt any interpretation of the maxim, which shall lead to such consequences. It would remove the whole force of the prohibition, and submit the whole subject in criminal trials to the discretion of the court. I have always understood that the great object of this clause was, on the contrary, to take away all discretion, and to forbid all courts of the United States from trying a man twice upon a good indictment for the same offence. It has been supposed that in all cases of conviction there may be ground to grant a new trial, because it will always be in favor of the prisoner. If this were true, the difficulty would still remain, that the constitution does not provide for a new trial only where it is favorable to the prisoner. If the twice being put in jeopardy is referrible only to cases after judgment, and not after verdict; and before judgment, even a new trial may be granted, though it may be unfavorable to him. Cases of conviction may readily be conceived, in which a new trial may be injurious to the prisoner. If, after conviction, it may be granted at his request, it may also be granted without his consent. Suppose a man indicted for murder and convicted of manslaughter; can a new trial be granted at all, unless by putting him twice in jeopardy of his life? Suppose a robbery of the mail, charged in the indictment with being effected by wounding the carrier, or putting his life in jeopardy (which is a capital offence), and there is a conviction of the robbery without such aggravated circumstances, can a new trial be granted, upon the application of the government or of the prisoner? Many other cases of a like nature may be easily put, where the offence in an aggravated form is a capital felony, and without such aggravations not. Yet the power to grant a new trial in cases of conviction, if it exists at all, is general, and may be required by the government as well as by the prisoner.

Upon the whole. having given this subject the fullest consideration. I am, upon the most mature deliberation, of opinion that this court does not possess the power to grant a new trial, in a case of a good indictment, after a trial by a competent and regular jury, whether there be a verdict of acquittal or conviction. My judgment is, that the words in the constitution, "Nor shall

any person be subject, for the same offence, to be twice put in jeopardy of life or limb," mean that no person shall be tried a second time for the same offence, where a verdict has been already given by a jury. The party tried is in a legal sense, as well as in common sense, in jeopardy of his life, when a lawful jury have once had charge of his offence as a capital offence upon a good indictment, and have delivered themselves of the charge by a verdict. In this respect I follow the doctrine of the supreme court of New York; and the doctrine of the supreme court of Pennsylvania and North Carolina goes not only to the same extent, but includes cases where the party is once put upon his trial before the jury, and they are discharged from giving a verdict without extreme necessity. This too is the clear, determinate and well settled doctrine of the common law, acting upon the same principle, as a fundamental rule of criminal jurisprudence. I deem it a privilege of inestimable value to the citizen; and that it was introduced into the constitution upon the soundest principles of prudence and justice. But if it were otherwise, it is my duty to administer the constitution as it stands and not to incorporate new provisions into it. If this clause does not prohibit a new trial, where there has already been a regular trial and verdict, then it is wholly immaterial whether the verdict is of acquittal or of conviction of the offence; and the same party may, in the discretion of the court, be put upon his trial ten, nay, twenty times, if the court should deem it fit. It was (as I think) among other things, to get rid of the terrible precedents on this subject alluded to by Lord Hale, and even acted upon by him, in the reign of Charles II., in discharging juries from giving verdicts upon frivolous or oppressive suggestions, that this great maxim of the common law was engrafted into the constitution. The constitution has also in another clause declared, that "no fact once tried by a jury shall be otherwise reexamined in any court of the United States, than according to the rules of the common law." The only modes of making this re-examination known to the common law, are by a writ of error and a new trial, and if by the common law there cannot be a new trial in a capital case, after a regular trial once had upon a good indictment, as seems to me to be conclusively established by the English authorities already cited, then this clause also carries in its bosom another virtual prohibition.

Lest I should be thought to have overlooked the case of U. S. v. Daniel, 6 Wheat. [19 U. S.] 542, where the circuit court divided upon the motion for a new trial, I beg only to say that the point whether the circuit court had jurisdiction to grant a new trial in a capital case, was not before the court. It was a mere certificate of division of opinion of the circuit court; and the supreme court held that it had no jurisdiction to entertain the point certified, so far as it regarded a new trial.

If the language used by me in the Commentaries on the Constitution (3 Story, Const. c. 38, § 178) should be thought to inculcate a different doctrine, I can only say that I do not so understand it. I have no doubt that there are cases where there may be a new trial; as in cases of a mis-trial by an improper jury. See People v. M'Kay, 18 Johns. 212; 2 Hawk. bk. 2, c. 36, § 15; Rex v. Keite, 1 Ld. Raym. 139; 2 Hawk. P. C. c. 27, § 104; Id. c. 47, § 12; Arundel's Case, 6 Coke, 14. But in the language there used, it should be considered that the author was not summing up his own private or judicial opinions, but only gathering together the opinions of others, which had come to his knowledge, to illustrate the text. But if there be any erroneous opinions inculcated in those Commentaries, which upon more deliberate examination I should deem unfounded, I trust that I shall be the last person to insist upon them as obligatory or correct. My duty, as a judge, is to pronounce such a judgment as my conscience dictates, without reference to any preconceived opinions. But I freely admit that I see nothing in that passage of the Commentaries, so far as relates to the granting of new trials, which I deem incorrect, or which I wish to retract.

It may be thought by some, that there may be great inconvenience in the establishment of this doctrine. But if there be, it is for those who possess the power to amend the constitution to apply the proper remedy. For myself, I entertain great doubts whether, in the actual administration of public justice, the present doctrine would not be far more safe and useful than an unlimited power to grant new trials in all capital cases, at the mere discretion of the court. It may be, that a court may sometimes err in the proper administration of the law; and it may also err in granting or refusing a new trial. But the consciousness that the trial is final, will always impress every court, mindful of its duty, with the utmost caution in all its opinions and judgments in capital cases, where the result may be unfavorable to the prisoner. It will naturally induce it to lean to the side of mercy; and it will look anxiously to the dictates of the law. But still if, after all, errors should intervene, it will be but the common infirmity of the administration of all human justice. And the prisoner, even in such a case, will not be wholly without redress. He may apply for a pardon or mitigation of the sentence, to the executive; and it cannot be doubted that the court itself, if conscious of any serious error, would cheerfully aid in his application. Hitherto this ultimate appeal to the pardoning power has been deemed satisfactory and safe in the land of our

ancestors down to our own age; and it has been deemed equally satisfactory and safe in all those states whose jurisprudence does not permit a new trial in capital cases under like circumstances. But whatever might be my opinion as to the authority of this court to grant a new trial in capital cases generally, I shall, under the present circumstances go over all the grounds insisted upon by the prisoner's counsel (some of which being in arrest of judgment, are indispensable to be disposed of before judgment), because if any error in point of law has been committed by the court, injurious to the prisoners, or upon established principles of law, they ought (if the court could grant it) to have a new trial, I should feel it my duty to make a direct application in their behalf to the executive for a pardon, to redress the error. God forbid that any man in this country should suffer death against the law, from the mere infirmity of judgment of those who are appointed to preside at his trial.

The first cause assigned for a new trial is the discovery of new evidence. For the present I shall pass over this point, intending to examine it when all the other grounds shall have been passed under review.

The second cause is, that the prisoners were not permitted to be tried separately, although they made a motion for this purpose. Now, this has been long since settled by the supreme court of the United States to be a matter, not of right, but of sound discretion to be exercised by the court. So it was held in the case of U. S. v. Marchant, 12 Wheat. [25 U. S.] 480, upon the fullest consideration. The sole ground upon which the present motion was made, was that by means of separate trials, the prisoners wished and intended to make use of the testimony of each other in their defence. Now I was of opinion, and still am, that the reason assigned was wholly, in a legal point of view, inadequate to justify the court in the exercise of such a discretion. The charge was a charge of a joint piracy on the high seas, committed by all the prisoners, found by the grand jury upon their oaths, and therefore to be taken prima facie to be well supported by competent evidence before them. There is no pretence now to say, when the trial has been had, that there was not a solid ground of probable cause to put all the prisoners in the indictment as confederates in the act, or that any of the prisoners were included upon mere false suggestions, to evade their testimony. It is clear by law that confederates in the same piracy, put upon trial at the same time, are not competent witnesses for each other. And I do exceedingly doubt whether in point of law the court possess the right to make witnesses competent in a trial by any act of their own, who would otherwise be incompetent. The government has rights as well as the prisoners. The government is

not to be deprived of its rights merely because the prisoners request a separate trial. In a joint trial the government has a right to exclude all the prisoners from being witnesses. If the court deprive the government of this right, it is an exercise of power which may sometimes subvert the purposes of justice. It certainly does not necessarily promote it. It is no just cause of complaint on the part of prisoners, that they stand jointly indicted; for they can rarely be so, except where they have mixed themselves up with the criminal transaction in a manner which in the sober judgment of the grand jury implicates them in the common guilt. I have never before known a case, in which the sole ground for a separate trial has been to make the witnesses competent for each other. In the only cases in the circuit court in which a separate trial has been granted, there has been an express disclaimer of using the confederates as witnesses; and the defence has been exclusively placed upon several and distinct grounds. In the present case the main argument was at the trial, and now is rested upon a defence common to all the prisoners, viz. that the robbery was not by the Panda or her crew; but by some other vessel. If, therefore, the question were now to be decided over again, I should, under the circumstances, refuse to concur in a separate trial of the prisoners. I should doubt the legal right so to do, for the cause assigned. And I cannot but think that the granting it in a case of this sort (in which, if in any case, there ought to be a joint trial), would be an abuse, and not a just use of a sound discretion.

The third, fourth and fifth causes embrace in different forms the same subject matter. The prisoners, who are all foreigners and strangers to our institutions, and do not, as far as we know, speak or understand the English language, and with whom the court could communicate only by an interpreter, were, after the indictment was found against them, brought into court and were informed that they were entitled to copies of the indictment, and should be furnished with them two full days before they were required to plead; and that they were entitled to counsel to assist them in the defence, and that the court would assign such counsel as they desired,—and accordingly the learned gentlemen, who have since conducted the defence, were so assigned; and that at a subsequent time, after two full days, they would be arraigned and required to plead to the indictment. Accordingly, after this period had elapsed and the copies were duly furnished, the prisoners were brought to the bar, and in the presence of their counsel were arraigned, and upon their arraignment they severally pleaded not guilty. But, as is said, the clerk of the court upon this arraignment did not further proceed, upon their pleading not guilty, to

ask the prisoners how they would be tried, so that they did not make the usual and common reply, "By God and the country." The district attorney then moved the court to assign a time for the trial of the prisoners, and accordingly, at the request of the prisoners' counsel, a particular day, named by themselves, was assigned for the trial. It was then stated to the prisoners, that they were to be tried by a jury, that the list of the jurors would be furnished to each of them (and they were accordingly furnished) two full days before the trial, that they might exercise their full right of challenge. Accordingly at the time assigned the prisoners were brought to bar for trial; they were then distinctly and in the usual manner informed by the clerk, that they were then set at the bar to be tried, and that the good men and true, whom he was then to call, were to pass between them and the United States at the trial; and that if they would object to any of them, they must do it as they were called, and before they were sworn. The jury were accordingly called, and not the slightest objection to the trial by the jury was intimated, either by the prisoners or their counsel; but the prisoners proceeded, with the assistance of counsel, to make their challenges, (amounting, I believe, in all, to thirty-six), and all the jurors sworn and impannelled were those to whom they declared that they had no objection. The whole cause was then most elaborately examined and heard; the fullest defence made; and the jury returned their verdict, as it appears upon the record. Now, the objection is, not that no similiter is joined (for it is admitted that this is not necessary) but that there is no issue to the country, until the prisoners have expressly put themselves, by the words already quoted, "upon God and the country;" and that until such an issue there can be no trial. In order fully to understand the nature of the objection it may be well to state the course of the proceedings at the common law in England; and this may be taken from the very ample account given by Mr. Justice Blackstone in his Commentaries (4 Comm. c. 25, pp. 322–331; Id. c. 26, pp. 332–341). See, also, 2 Hale, P. C. c. 43, pp. 314–322; Id. c. 28, pp. 216–225. When the prisoner is brought into court to answer the indictment, he is said to be brought in to be arraigned thereon; for "to arraign is nothing else but to call the prisoner to the bar of the court, to answer the matter charged upon him by the indictment." The indictment is then read to him, and when called upon to answer, he either stands mute or confesses the fact (which we may call incidents to the arraignment), or else he pleads to the indictment. Regularly a prisoner is said to stand mute upon being arraigned upon a capital felony, when he either (1) makes no answer at all; or (2) answers foreign to the purpose or with such

matter as is not allowable, and will not answer otherwise; or (3) what is most material to the present purpose, upon having pleaded not guilty, refuses to put himself upon the country. If he says nothing, the court ought ex officio to impannel a jury to inquire, whether he stands obstinately mute, or whether he be dumb ex visitatione Dei. If the latter is the case the court proceed to the trial, and examine all the points, as if he had pleaded not guilty. If he be found obstinately mute, in cases of treason and petit larceny and misdemeanors, his standing mute was deemed equivalent to a conviction, and he received the same judgment and execution. In other capital felonies the prisoner was not anciently deemed convicted, but for his obstinacy he received the terrible sentence of penance, or peine forte et dure (as it was called) which in substance was, that he was put into a low dark chamber, laid on his back naked, and a weight of iron, as great as he could bear, placed on his body; he was to have no sustenance save only on one day three morsels of the worst bread, and on the second day three draughts of standing water that should be nearest to the prison door; and in this situation this should alternately be his diet till he died. And this remained the law in England, though rarely put in force, until 12 Geo. III. c. 20, when it was enacted that all persons who should stand mute on being arraigned for felony or piracy, should be deemed convicted of the offence and punished accordingly.

We next come to consider the general issue, as it is called, which is the plea of not guilty. When upon his arraignment the prisoner pleaded not guilty, the clerk immediately enters upon the record "Not guilty," or as it stood anciently abbreviated, "Non cul" for "non culpabilis"; and immediately the reply of the government, supposed to be [3] given viva voce, that the prisoner is guilty (and by Blackstone supposed to be indicated by the abbreviation "cul. prit."), though in point of fact such reply is never formally made. When this is done issue is then said to be joined; for Mr. Justice Blackstone informs us that, "immediately upon issue joined, it is inquired of the prisoner, by what trial he will make his innocence appear," which the clerk does by the words, "How wilt thou be tried." And indeed this must necessarily be so, for until an issue is virtually joined between the parties, there is nothing to be tried, and of course there can be no trial, until something is to be tried. And the question propounded becomes thus intelligible. So that the remark of the district attorney is critically correct, that there is a joinder of the issue, before we arrive at this stage of the arraignment. See 1 Chit. Cr. Law, 416. In order to as-

---

[3] Mr. Christian's account in his note to 4 Bl. Comm. 340, note 1, appears to me far more probable than that of Mr. Justice Blackstone.

certain why this inquiry is made, it is necessary to state that anciently in England the party accused had his choice of being tried in one of two manners. by battel, or by a jury. And in those times of course it was indispensable that he should be put to his election. If he chose the trial by battel, he was accustomed to say that he would be tried by God; if by a jury, that he would be tried by the country. But since the trial by battel was abolished (as it has been for ages upon indictments), there can be no trial but by a jury; and hence in England, where the old form was still retained, the refusal to answer that he would be tried by God and the country was treated as a refusal to put himself upon the inquest in the usual manner, and therefore as legally standing mute. Now in America, the trial by battel was never introduced at all; and the only trial since the first settlement of the country has always, in criminal cases, been by a jury; and could not be in any other manner. But in England the right of trial by battel in certain cases continued down to our own day, viz. in cases of appeals and approvements: and as late as the case of Ashford v. Thornton, 1 Barn. & Ald. 405, in 1818, was acted upon, though it has been since abolished by a recent statute. The continuation of the form in England may thus be easily accounted for; and though in America it has very probably been acted upon in many states, it would be proper only, where the common law rule that the party might otherwise be deemed to stand mute, was in force; for I believe that the punishment of peine forte et dure, never was adopted in any part of America. And it seems to me. that in all those states, where the constitution provides that the trial of all crimes shall be by a jury, and the prisoner pleads not guilty, it is a mere mockery to ask him how he will be tried, for the constitution has already declared how it shall be.

But be this as it may under the state governments, I am clearly of opinion, that the form is wholly unnecessary under the constitution and laws of the United States in the federal courts. The constitution has expressly declared, "that the trial of all crimes except in cases of impeachment shall be by jury." It is imperative upon the courts, and prisoners can be lawfully tried in no other manner. As soon, therefore, as it judicially appears of record that a party has pleaded not guilty, there is an issue in a criminal case. which the court are bound to direct to be tried by a jury. The plea of not guilty does import of itself a tender of a proper issue, and the attorney for the government, in demanding a trial of that issue, necessarily requires it to be by a jury. And so in point of fact, the plea of not guilty is always understood by the court. When the clerk enters it upon record, in making up the record he usually adds to it "and of this he (the prisoner) puts himself upon the country." And in misdemeanors this is the common course in Eng-

land. And why? Plainly because in the case of a misdemeanor there never could be any other trial than by jury; and therefore, in cases of misdemeanor. the prisoner never is asked how he will be tried; but his plea of not guilty is of itself an issue to the country. The laws of the United States establish this to be the true view of the matter, at least in the courts of the United States.

The crimes act of 1790 (chapter 9, § 30) provides that if any person shall be indicted for treason, and shall stand mute or refuse to plead, or shall challenge peremptorily above thirty-five of the jury; or if any person be indicted of any other capital offence, &c., if he shall stand mute or will not answer to the indictment, or challenge peremptorily above twenty of the jury, the court in any of these cases, shall, notwithstanding, proceed to the trial of such person, as if he had pleaded not guilty, and render judgment thereon accordingly. And the act of 1825, c. 276, § 14 [3 Story's Laws, 2002; 4 Stat. 118], provides the like rule in regard to offences not capital, declaring that in such cases the court shall proceed to the trial of such person as if he had pleaded not guilty, and upon the verdict render judgment accordingly. Both of these statutes clearly establish that the party is not to be understood to stand mute. when he has pleaded not guilty; and that as soon as the plea of not guilty is put in, the cause must be tried by the jury. It is impossible, consistently with the language of these acts, for the court to adjudge that the party stands mute, when he pleads not guilty; and if he does not. in contemplation of law, stand mute after such plea. then the plea of not guilty includes every thing essential to put him on trial by the jury.

It ought to be added, that the present, being a charge of piracy on the high seas, was not originally or practically within the ancient rules of proceedings at the common law on land. On the contrary until the statute of 28 Henry VIII. (chapter 13), piracies on the high seas were exclusively triable in the admiralty according to the course of the civil law; and that statute first made them triable by a jury in the common form of jury trials. 4 Bl. Comm. 71, 269; 1 Hawk. P. C. bk. 1, c. 20, §§ 17, 18. So that the trial by battel was never applied to them; nor until the statute of Henry VIII. were the forms of arraignment consequent thereon at the common law. Besides, what is the reason, even at the common law, of asking the prisoner how he will be tried? It is to ascertain whether he consents to a trial by jury. If he does consent in any clear and determinate manner, it is manifest that he cannot object that the form has not been gone through, if the substance has been preserved. Now, in the present case there is the most ample proof of a consent, if consent were necessary, by the acts of the prisoners. and of their counsel before and at the trial. And if the prisoners had refused to consent, the trial must have

been in the same manner precisely as it has been had. But I confess for one, that I deem it a little short of an absurdity in the courts of the United States to call upon the prisoners, after they have pleaded not guilty, to say how they will be tried, when the constitution and laws have peremptorily required the trial to be by jury. Suppose the prisoners had been asked, how they would be tried, and they had answered that they wished for no trial at all; must not the court have proceeded to try them upon the plea of not guilty? Suppose they had answered that they wished to be tried by the court, could the court have tried the cause otherwise than by jury? Suppose they had been silent as to how, and when, and whether, they should be tried, could the court have done otherwise than order a trial by jury? We have no authority to inflict the punishment of the peine forte et dure (and I trust our courts never will have it), and our laws manifestly contemplate no such thing as either legal or necessary. It appears that by a recent statute in England (St. 8 Geo IV. c. 28) it is provided that, if a person being arraigned upon an indictment for treason, felony, or piracy, shall plead thereto a plea of not guilty, he shall by such plea, without further form, be deemed to have put himself upon the country for trial. And this is precisely what our laws, in my judgment, do in effect prescribe. The provision was indispensable in England, since the refusal of the prisoner to state, after he had pleaded not guilty, how he would be tried, was deemed in law as standing mute. In our law he cannot be deemed to stand mute, when he has pleaded not guilty. The constitution decides how he shall be tried, independent of any election on his part. The plea of not guilty puts the party for all purposes upon his trial by jury. My judgment, therefore, is that there is nothing in this objection.

The sixth cause respects the overruling by the court of a question asked by the prisoners' counsel, the relevancy of which was not perceived by the court, and the counsel refused to state it. The fact afterwards came out (I believe) incidentally upon the answer to other questions. But at all events, the relevancy of the question not having been shown at the time (and indeed not even now at the argument), it is clear that there is no ground to say that it ought to have been put. It would otherwise happen, that the right of cross-examination might extend to everything, whether it were material or immaterial, which had occurred in the whole course of the witness's life.

The seventh objection relates to certain supposed errors in the instruction of the court. The first specification respects the supposed remark of the court that Perez was not an accomplice. What the court actually said was this—After stating to the jury that a conviction ought not to be upon the naked testimony of an accomplice, unless strongly corroborated by other evidence or circum-

stances, the court said, that it was not to be taken as a matter of course that Perez was an accomplice. That was for the jury to consider. Perez, in his testimony, utterly denied that he was an accomplice; the defence was, that the crime was never committed by any of the crew of the Panda; and if the crime never was committed at all, Perez could not be an accomplice. The government alone insisted that Perez was an accomplice. And under these circumstances, the jury were to say, whether he was an accomplice or not, upon the evidence. It is now argued (as I understand it) that Perez might have been an accomplice, although the crime was never committed. This appears to me, in point of law, wholly unmaintainable—and at all events, the court left the matter to the jury upon the whole facts, exactly as the evidence and circumstances placed it before them.

The next specification is to the supposed instruction of the court as to the effect of the non-production of the written examinations, under the circumstances. These circumstances took place in the presence of the court and jury. The counsel for the prisoners made a written demand of the district attorney to produce the examinations of Perez and several of the prisoners taken at Fernando Po; the district attorney offered to produce them, if the prisoners would read them, or suffer them to be read, to the jury. The counsel for the prisoners declined to receive them upon that condition. But they afterwards stated that the district attorney might, if he chose, read them to the jury, as papers produced by him; and they would waive any objection to the examination of Perez being under oath. The district attorney declined so doing, saying he was not in the habit of using the confessions of prisoners against them. Such was the substance of the proceedings—and the court were asked, under these circumstances, to instruct the jury that the suppression of the examination of Perez by the district attorney, afforded a legal presumption, that if produced, that examination would be unfavorable to the credit of Perez. Whether the district attorney was right or not in insisting upon the withholding of the examinations, unless upon the terms proposed by himself; and whether the counsel for the prisoners were discreet or not in their offer, which was not accepted, are matters with which the court had nothing to do, and upon which they were not bound to express any opinion; and with which I do not now intermeddle, for they are matters properly resting in the discretion of the counsel on each side. But the court left the whole matter to the jury, instructing them that they might draw such inferences from the circumstances in evidence as they pleased, and which were warranted by them, provided they were not unfavorable to any of the prisoners; and that they ought not to presume any thing from these circumstances

against the prisoners. In this instruction I cannot now perceive any thing objectionable. And I know not how, consistently with the rules of law, the court could have, told the jury that the circumstances afforded a legal presumption against the credit of Perez.

Another specification is the supposed instruction of the court as to Captain Trotter's liability for loss and damages occasioned by the capture of the Panda. At the trial a vast deal of argument was urged to the jury by the closing counsel for the prisoners, to establish gross misconduct on the part of Captain Trotter, and his liability to losses and damages for his acts; and thus to found imputations that he had a vital interest in this prosecution, and to influence the testimony of the witnesses. And upon the present motion, the same line of argument has been with even more zeal and earnestness pressed upon the court. At the trial the court said, that they did not perceive that these charges were made out by the evidence, but of that the jury would judge for themselves. But that the guilt or innocence of the prisoners at the bar did not depend upon the good conduct or malconduct of Captain Trotter. That Captain Trotter may have conducted himself incorrectly, and yet the prisoners may be guilty. And on the other hand, he may have had probable cause for the capture, and have acted bona fide, and with the most correct intentions, and yet the prisoners may be innocent. This instruction I then thought, and still think, entirely correct; and I cannot think that it was at all injurious to the prisoners.

Another specification is the supposed instruction of the court that certain confessions of the prisoners were proper for the consideration of the jury. It is to be observed, that none of these confessions were brought out by the district attorney against the prisoners upon the direct examination of the witnesses—but they were all brought out upon the cross-examination of the prisoners' own counsel. The court stated to the jury that these confessions were not to be viewed in any different light from their coming out upon the cross-examination, from what they would be, if they had come out upon the direct examination. But that these confessions, so far as they were not reduced to writing, were in the case, and were to be considered by the jury. And afterwards, upon the suggestion of the prisoners' counsel (whether rightly or not I do not now say in point of law) that the confessions, reduced to writing, and not now produced, ought to be disregarded by them, although they came out upon direct interrogatories of the cross-examining counsel. In this instruction I can as yet perceive no error; though I confess that upon farther reflection, I do doubt, whether, under all the circumstances of the case, the court were right in directing the jury to disregard the confessions of the prisoners which were reduced to writing and not

produced. But if there was any error in this direction, it was manifestly favorable to the prisoners.

The next specification referred to the same matter of the suppression of the said written examinations and confessions of the prisoners by the district attorney, under the circumstances above-mentioned, and called upon the court to instruct the jury, that, under the present circumstances, the suppression of these writings afforded a legal presumption that, if the same were brought forward, the effect thereof would be in favor of the prisoners. The court left the matter at large to the jury, in the manner above-mentioned, as matter of fact, and presumption of fact, to be weighed by the jury, but with the express direction that they ought not to presume any thing unfavorable to the prisoners. There was no matter of presumption of law in the case, but of presumption of fact only; and I am entirely satisfied that the court did all that it ought in law to have done in this direction.

The next specification is upon the same subject, and required the court to decide, that the district attorney ought to have put these writings into the case, or the parol testimony of the same confessions, which had been proved to be reduced to writing, ought to have been wholly rejected, and considered out of the case. The court did, under the circumstances (as above stated), direct the jury to disregard the parol testimony of any of the confessions which were reduced to writing. The district attorney did offer to put these writings into the case, if the prisoners' counsel required him to do it. So that there is no legal ground of complaint on this head.

Another specification respects the confessions, stated to have been made by the witnesses, or one of them, of some of the prisoners at the bar, without naming them, being allowed to go as evidence to the jury. Now, the confessions thus referred to, were brought out upon pointed interrogatories in the cross-examination: and the counsel for the prisoners did not follow up the cross-examination, and ask who the particular prisoners were. Upon examining my minutes of the testimony, I find that Domingo said, that he heard some of the crew confess to the captain of an English brig, that they had robbed an American brig. They had a Portuguese interpreter, who spoke English and Portuguese. The first five that were captured, confessed. Some of them are here. He afterwards stated, that some of them were examined on board, and some on shore, at Fernando Po: and he proceeded to give the names of those who confessed at Fernando Po, viz. Montenegro, Garcia, Castillo, Perez, Delgado, and Guzman. Now there was evidence, in other parts of the testimony, to show that the five who were first captured were Montenegro, Garcia, Castillo, Perez, and Delgado. Silveira (another wit-

ness), according to my minutes, testified to various confessions. Among others, he stated that he went in an English transport, with five others, viz. Delgado, Perez, Garcia, Montenegro, and Castillo, to Ascension; that some of the prisoners at the bar told him at Ascension, that they had robbed the Mexican. He stated, also, that they had confessed it to him, not once or twice, but several times; that the three of the prisoners, who were present at the governor's house at Fernando Po, said they had robbed the Mexican; that the day before they denied it, but this last day they all confessed it, and laid the blame to the captain and officers; that the declarations at the governor's house were not taken down in writing. Now these are but part of the confessions stated in the case, for Perez stated others; and the whole matter, as matter of evidence, was left to the jury under all the instructions in the case; and the court instructed the jury on this point, that if the persons who made the confessions at any time were not identified, but the statement was only that some did, or three did confess, not being named, and not being identified, such confessions could not be applied to any of the prisoners in particular as proofs of his guilt; but the evidence under such circumstances being in the case, might be weighed by them, so far as it applied to the identification of the Panda as the vessel which committed the robbery of the Mexican. Upon the most mature reflection, I am not persuaded that there was any error in this instruction.

The next specification is, that the court declined to instruct the jury, under the circumstances stated in the instruction prayed, that a legal presumption arose that the log-book of the Panda was taken at the same time and place, and by the same captors, and that they have it, or have destroyed it. Now, without dwelling upon the manifest impropriety of giving this instruction as asked, as it assumes certain facts, not admitted to be proved, the court, in my judgment, would not have been justified in giving any such instruction as a matter of law. But the testimony, so far as there was any evidence on the point before the jury, positively denied any possession of the log-book by the captors; and Mr. Quentin directly stated, that it was not on board at the time when he boarded and captured the Panda; and that he never heard of its having been obtained afterwards. And there was not a tittle of proof upon the other side that it had come to the possession of the captors. The court did, however, instruct the jury, that if they did believe that the log-book of the Panda had come to the possession or power of the captors, or of the government officers, their omission now to produce it was a circumstance unfavorable to the captors, and favorable to the prisoners. It appears to me that this was going to the extreme limits of the law in favor of the prisoners.

The next specification being to the same point requires no further notice. The court gave an instruction in favor of the prisoners, if the log-book was proved to be in the possession or power of the government prosecutors.

The next specification is, that the court admitted parol evidence to establish the time of the sailing of the Panda on her voyage from Havana to Cape Mount, and to prove the course and termination of the voyage, without proving that the log-book was missing or lost. This objection is, as I understand it, founded upon the notion that the log-book is not only evidence of these facts, but the only proper evidence, and the best evidence, if it can be produced. I do not so understand the law. The log-book is in no just sense proof per se of the facts therein stated, except in certain cases provided for by statute. It is not evidence under oath. It does not import legal verity. It could not, if it had been produced by the prisoners, have been per se admitted (if objected to) as evidence of the facts stated therein. It would be mere hearsay not under oath. It might be introduced against those of the prisoners, to whom it should be brought home as having a concern in writing or directing what should be contained therein, to contradict their statements or their defence. But I am yet to learn that parties can thus create evidence for themselves by inserting facts in a log-book. I know of no such rule of law; and no authorities are introduced to establish its existence. In the most common class of cases in which the log-book is used, those of insurance, the log-book has never, to my knowledge, been allowed (if objected to) as proof of the loss for the assured. The officers or others of the crew, constantly prove all the facts by parol. The log-book is often called for by the underwriters to contradict their statements on the stand; or to control or weaken the influence of these statements.

The next specification is, that the court declined to instruct the jury that under the circumstances proved, resistance, flight, or the destroying of the Panda by her officers and crew would be exercising the right of self-defence on the part of the said officers and crew. For myself, I confess that it is utterly inconceivable to me, how the court could give any instruction in the manner required by this prayer. What were the circumstances? They were matters of fact to be ascertained and fixed by the jury. The court could not affirm what they were, or, before they were ascertained, declare to what extent the right of resistance might go. The court cannot judicially know why and wherefore the flight of the Panda's crew took place. It may conjecture that the jury have thought that it was occasioned by a fear of being captured, as pirates. But we cannot say so. Neither can we, nor could we at the trial say why it was done, or whether it was done for other justifiable reasons. It did not in-

deed appear from any evidence in the case, that there was any resistance to capture by the Panda's crew. And the defence expressly denied that there was any intention to blow up the vessel. On the contrary, an elaborate argument was introduced to establish the contrary. It is a little difficult, therefore, to see why these ingredients should have been thought so essential to the merits of the case presented in behalf of the prisoners. But the court left the whole matter to the jury, and stated that if the Panda's crew did believe and act upon the ground, that there was an intended hostile attack by public enemies or by pirates, their right of resistance and self-defence in any manner which they might deem most beneficial, was not to be doubted. As I understood the application of the prisoners' counsel, the court enlarged the prayer from a mere hostile attack (which was supposed to mean an attack of public enemies) to an attack also by pirates. But in every view my opinion is that the court stated the law correctly, and could not properly have gone farther.

The next and last specification under this head is that the court declined to instruct the jury that the failure of the government to produce the witness, who (it was testified) saw the match applied for the purpose of blowing up the Panda, and removed it, afforded a legal presumption against the truth of the alleged attempt by the prisoner Ruiz to destroy the Panda. Now it appears to me, that if there was any presumption at all to be drawn from this failure to produce the witness, it was a presumption of fact, and not a presumption of law; and as a presumption of fact, it was most strenuously urged to the jury by the prisoners' counsel. The argument now is, that although Mr. Quentin, who was upon the stand, stated that he was on board at the same time with the witness, that he saw the smoke coming from the cabin, and the absent witness go down, and bring up the match, and many other circumstances to establish an intention to set the Panda on fire and blow her up; yet that his testimony was not the best evidence on this point, and ought to be rejected; and not only so, but the failure to produce the witness afforded a legal presumption against the truth of the alleged attempt to destroy the Panda. It appears to me that the whole basis of the argument is founded upon a mistake of the meaning of the rule of law as to the production of the best evidence. The rule is not applied to evidence of the same nature and degree; but it is applied to reject secondary and inferior evidence in proof of a fact, which leaves evidence of a higher and superior nature behind, in the possession or power of the party. Thus, if the party offers a copy of a paper in evidence, when he has the original in his possession, the copy will be rejected, for the original is evidence of a higher nature. So, oral testimony is inadmissible to prove the contents of a written instrument,

when the paper is in the possession or power of the party; for it is not of so high a nature as the paper itself. But the rule does not apply to several eye witnesses testifying to the same facts, or parts of the same facts, for the testimony is all in the same degree; and where there are several eye witnesses to the same facts, they may be proved by the testimony of one only. All need not be produced. If they are not produced, the evidence may be less satisfactory or less conclusive, but still it is not incompetent. And to apply the principle to the present objection. Mr. Quentin was a competent witness to prove all the facts, which he knew, which went to establish an intention to blow up the Panda. That another witness might have proved more and other facts to the same purpose, which might have been more full and satisfactory and conclusive to the jury, does not render Mr. Quentin's testimony incompetent. The defects in the evidence, whatever they might be, are very proper matters of observation to the jury, to create doubts or justify disbelief of any intention to blow up the Panda. But the jury were to judge of all these matters in weighing the whole evidence on this particular point. A witness who has seen a party write several times is a good witness to prove his handwriting. But a clerk in the counting-room of the party, who has seen him write innumerable times, would be in many cases a more satisfactory witness to prove the handwriting. But nobody can doubt that each would be a competent witness of the facts within his knowledge to prove the handwriting.

Another cause assigned for a new trial is that the jury were furnished with newspapers in their room, and did read them during the pendency of the trial; and subsequently another ground was added in a supplementary paper, that the jury drank ardent spirits while they had the cause in charge. It is important to a right understanding of these objections, to state the real facts and circumstances attendant upon the trial. The trial lasted, I believe, about fifteen days, during which time the jury were kept together night and day in the custody of officers. Some of them were engaged in very pressing business, which required them to communicate with friends respecting that business; and one or more of them was in ill health during the trial, and was obliged to have the aid of a physician. These circumstances were stated in open court, and it was agreed between the counsel in open court, that the jury might have all reasonable refreshments during the trial, that they might communicate on business with their friends, and write and receive papers from their friends on business, the papers being previously examined, and the conversation witnessed and heard by one or more of the officers of the court. And the court requested the jury during the trial, and until the arguments were heard and the charge given, not

to converse with each other on the subject of the trial, in order to keep their minds open to the last moment to all the merits of the cause. While the jury were thus kept together, they were allowed by the officers of the court attending them, to read the public newspapers, the officers first inspecting them and cutting out every thing that in any manner related to the trial. And it now appears, as well from the affidavits of the officers, as from the affidavits of the jurymen, that in point of fact they never saw any thing in any newspaper relative to the trial. The officers granted the indulgence to read the newspapers, under a mere mistake of their duty, and as soon as the charge was given by the court, the jury were not allowed to see any newspaper, until after they had delivered their verdict in open court. So far, then, as reading the newspapers went, there is not the slightest reason to believe that it could or did in fact in any manner whatsoever affect the verdict or influence the jury. The evidence, as far as it bears on the point, negatives any supposition of this sort. And, speaking for myself, I must say that considering the protracted nature of the trial, and the necessary privations of the jury, and the importance of keeping them when out of court from too constant meditation upon the subject of the trial while it was yet imperfectly before them, I do not doubt that the indulgence had a tendency to tranquillize their minds, and to keep them in a state of calmness and freedom from anxiety highly favorable and useful to the prisoners themselves. Without doubt it was a great irregularity in the officers of the court, for which they may be punishable, to have granted this indulgence without the express sanction of the counsel or of the court. I am not aware that any such sanction was given. But it is not every irregularity of officers, which would justify a court in setting aside a verdict and granting a new trial, or treating the matter as a mis-trial. The court must clearly see that it is an irregularity, which goes to the merits of the trial, or justly leads to the suspicion of improper influence, or effect, on the conduct or acts of the jurors. We must take things as they are in our days. Juries cannot now, as in former ages, be kept in capital cases upon bread and water, and shut up in a sort of gloomy imprisonment, with nothing to occupy their thoughts. It would probably be most disastrous to the administration of justice, and especially to prisoners, to attempt, in these days, the enforcement of such rigid severities, so repugnant to all the usual habits of life. And for one, I am not satisfied that the irregularity in the present case has been in the slightest manner prejudicial to the prisoners; but on the contrary, as far as the evidence leads me to any conclusion, I should deem it favorable to the prisoners. The indulgence ceased the moment when the charge was given, and the jury were then put upon their own solemn and exclusive deliberations on the case.

The other ground is, that the jury, while they had the cause in charge, drank ardent spirits. Now it is most material to state certain facts which took place at the trial, and which though wholly passed over in this motion, yet essentially affect its validity and force. After the charge was given by the court to the jury, one of the jurors in open court stated that he had been unwell for several days, and still was so, and that it was impossible for him under the circumstances to confine himself to water, without danger to his health; and he wished permission to use such spirit as might be required for his health. The counsel for the prisoners then assented in open court to this indulgence, and it was also assented to by the district attorney, who at the same time suggested that the like indulgence ought to be extended to any others of the jurors, whose state of health, from the great length of the trial, and their unusual confinement, might also require it. The counsel for the prisoners then gave their consent to this extension of the indulgence. It was accordingly stated to the jury in open court that it was so granted; but they were at the same time advised to use the indulgence as little as possible, and in as moderate a manner as practicable. Now upon this statement, where there was an express consent given by the prisoners' counsel in open court to this indulgence to the jurors, it seems to me impossible that the present objection can be sustained, unless it is shown, that the indulgence was grossly abused, and operated injuriously to the prisoners. Of this there is not the slightest proof, nor indeed was it even pretended at the argument. On the contrary, the only evidence in the case to establish the fact of drinking ardent spirits, comes from one of the jurors, who is said to have stated, after the trial was over, that he was sick and went down to the bar, and got a glass of brandy and water. The juror himself has not been examined. And this renders it wholly unnecessary to consider the authority and bearing of the cases cited at the bar on this subject: and especially the cases of People v. Douglass, 4 Cow. 26, Brant v. Fowler, 7 Cow. 562, and People v. Ransom, 7 Wend. 417, for they all turn upon very different circumstances.

The other parts of the original motion are in arrest of judgment, if the motion for a new trial should be denied. Some of the causes assigned for this purpose, viz. those respecting the arraignment, and that there was no joinder of issue, and no putting themselves upon the country for trial by the prisoners, have been already considered.

It only remains to take notice of the objections taken to the sufficiency of the indictment.

The first objection is, that no venue is laid

in the indictment; that is. that no particular place is stated on the high seas at which the robbery was committed, but it is only alleged that it was committed on the high seas. And reference has been made to some indictments in cases of piracy, where the offence is stated with more particularity of place, for example, "on the high seas in a certain place distant about ten leagues from Cursheen, &c." and "on the high seas about a half league distant from Leghorn, &c." See 3 Chit. Cr. Law, 1130 et seq.; Id. (English Ed.) 1135. See, also, Kidd's Case, 14 How. St. Tr. 130, 147, 187–190. But there certainly are precedents which contain no such specification of place (see 3 Chit. Cr. Law, English Ed., 1135); and in all the indictments for piracy in this district (which have been numerous, and upon which convictions and executions have taken place) our researches have not detected a single one in which such locality of place is to be found. The indictment has usually charged the piracy to be committed upon the high seas within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state, as it is charged in the present indictment, and without any further specification of place. And I am not aware that any different course of practice has been adopted in any other district. Now, it is certainly not sufficient proof that an indictment is bad substantially, to show that forms can be found which are more special and particular in their allegations of place; for such particularity may be adopted only ex majori cautela by the pleader. It will be necessary to sustain the objection to show some authorities, which establish the necessity of averring such special locality of the offence. or some principle of law, which leads to the same conclusion. No such authority or principle has been shown upon the present occasion. My opinion is that the objection is unfounded in point of law; and that the averment in the indictment, that the offence was committed on the high seas within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state, is sufficient certainty for all the purposes of the indictment and trial, without any other particular designation or averment of the locality of the offence. If such particular designation or averment of locality had been put into the indictment, it could not have tied up the proofs to that particular spot; but proofs of the commission of the offence in any other place on the high seas, would have sustained the indictment. The doctrine of venue in indictments at the common law is inapplicable to cases of this sort. At the common law all offences were required to be tried in the county where the offences were committed; and as the jury were to come from the neighborhood of the place where the offence was committed (technically called the "visne" or "visinage"), it was farther necessary to state in the indictment the particular parish, vill, or other place within the county from which the jury might come. And, in criminal cases it seems true even at this day in England, that the right to challenge the panel for want of hundreders exists, though it has fallen into disuse. See 1 Chit. Cr. Law (English Ed.) 177, 189, 190, 194, 196, 197; 4 Bl. Comm. 303, 305, 306. But even at the common law, although this certainty of averment of place was required, yet it did not tie up the party in his proofs; for the offence, if proved to have been committed any where within the county, was sufficient to maintain the indictment. See 1 Chit. Cr. Law, 200. But the reason of the common law for laying the venue so particularly in offences on land, does not in any manner apply to offences on the high seas; for no jury ever did or could come from the visne or visinage on the high seas to try the cause; and no summons could issue for such a purpose. And even now in England, when offences on the high seas are cognizable and punishable under the statute of 28 Hen. VIII. c. 15, by the special commission court, and by a jury of the county for which the commission is issued (see 4 Bl. Comm. 269; 2 Hawk. P. C. bk. 2, c. 25, §§ 43–47), no venue of any parish, vill or other place within the county is included in the indictment. The allegation that the offence was committed on the high seas is sufficient of itself to found the jurisdiction, and all the incidents of the trial and judgment. But if it were otherwise at the common law, we are to consider that, in the jurisprudence of the United States, the present is a statute offence, and that the jurisdiction is given also by statute; and if the offence is so laid in the indictment as to bring the case within the language of the statute in point of jurisdiction and certainty of description, that is all which can properly be required in our country. The crimes act of 1790 (chapter 9, § 8) provides that if any person shall commit upon the high seas, &c. murder, or robbery, &c., he shall on conviction suffer death. And it farther provides that the trial of all crimes committed on the high seas or in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he may first be brought. And there are direct and positive allegations in the present indictment to all these facts. So that the jurisdiction is upon the face of the indictment made out in the most positive manner. And the judiciary act of 1789 (chapter 20, § 29), has provided for the manner of summoning juries for all cases of trials in the courts of the United States. So that there is in reality nothing upon which to suspend a legal doubt as to the sufficiency of the indictment in this respect. No further venue is necessary than what the indictment contains. It in no manner affects the summoning of the jury.

The other objection to the sufficiency of the indictment is, that it concludes in the plural, "against the form of the statutes of the United States in such cases made and provided." whereas it ought to conclude "against the

form of the statute," &c. in the singular. It is admitted that the offence, as charged in the indictment, is within the act of the 15th of May, 1820 (chapter 113), and that if it is also within the crimes act of the 30th of April, 1790 (chapter 9, § 8), the objection is unmaintainable. Upon this point I profess not to feel the slightest doubt. There never was, as far as my knowledge extends, any judicial doubt breathed on any occasion that the act of 1790 (chapter 9) did apply to all murders and robberies committed on board of or upon American ships on the high seas. If the act did not apply to such cases, it is difficult to conceive to what cases it could legally apply. The general terms not only cover such cases, but many others. The only doubts that ever did occur, and were thought worthy of being considered by the supreme court, were, in the first place, whether murders and robberies, committed on the high seas on ships belonging exclusively to subjects of a foreign state and then under the acknowledged jurisdiction of a foreign sovereign, came within the meaning of the act. The supreme court, in U. S. v. Palmer, 3 Wheat. [16 U. S.] 610, thought they were not. Neither question was whether such offences committed on board of a piratical vessel, then in possession of pirates, and acknowledging the jurisdiction of no foreign sovereign, were within the meaning of the act. The supreme court, in U. S. v. Klintock, 5 Wheat. [18 U. S.] 144, decided that they were. On this occasion the court said that the opinion in Palmer's Case might well be understood to indicate an opinion "that the whole act of 1790 (chapter 9) must be limited in its operation to offences committed by or upon citizens of the United States," which is the very case before the court. And indeed Palmer's Case necessarily leads to this result. And the case of U. S. v. Furlong, 5 Wheat. [18 U. S.] 184, is direct to the same purpose, and covers the very case now before us. And, indeed, the language of the court upon this last occasion is express, that it is sufficient for the indictment in such a case to conclude against the form of the statute in such case made and provided (in the singular), although it might be equally within the act of 1790 (chapter 9) and the act of 1819 (chapter 77, § 5 [3 Stat. 513]), thereby laying down the broad principle that a conclusion against the form of the statute (in the singular) is sufficient in all cases where the offence is distinctly within more than one independent statute. But I am of opinion that the present case is equally within the act of 1790 (chapter 9) and the act of 1820 (chapter 113); and if so, then it is admitted that the conclusion is in the strictest sense right. And I am also of opinion, that if the offence was punishable by a single statute only, and the conclusion was against the form of the statutes (in the plural) that it would, in point of law, be a good conclusion. I am aware that there is some diversity of opinion in the books on this point; but having had occasion many years ago, in Kenrick v. U. S. [Case No. 7,713], to consider the question with great care, that was the conclusion to which my judgment deliberately led me; and I have since seen no occasion to change it upon principle or authority. Either way, then, the objection is unmaintainable.

These were all the causes or grounds contained in the original motion. At a subsequent day, however, other causes were assigned, which will now be considered.

The first is, that interpreters were admitted to interpret a part of the testimony of Perez without being previously sworn to interpret truly and faithfully. The facts were that Mr. Badlam was sworn as a general interpreter of Spanish at the trial, and in an early stage of his interpretation of some of the testimony, Mr. Child (one of the counsel for the prisoners, and who himself understood Spanish) objected to some of the interpretations as incorrect, and requested that two other gentlemen, whom he had selected, might be sworn as interpreters. This was objected to by the district attorney, who thought that it was his right to use such an interpreter as he had confidence in, leaving to the counsel for the prisoners to swear other interpreters in their own employ in the cause. The court then, upon the suggestion of the prisoners' counsel, allowed these two interpreters to sit near Mr. Badlam and the witness, and to suggest to Mr. Badlam any doubt or mistake in his interpretation, for him to consider and rectify. This was accordingly done; and whenever any such suggestion was made by these interpreters to Mr. Badlam (who did not profess to be well acquainted with Spanish nautical terms), he considered it, and I believe invariably adopted their interpretation, and then stated it to the court as his own interpretation. In a short time, however, it being perceived that the interpretation of nautical terms became very important in the cause, upon the suggestion of the court both of these interpreters were sworn, and one of them (Mr. Peyton) was afterwards, during almost the whole of the trial, used by the government as the exclusive interpreter. Now it is not, and it was not at the trial pretended, that ultimately any interpretation of the language of the witnesses by Mr. Badlam went to the jury, which was incorrectly given, without due correction. There was no dispute upon this head; and it could have been corrected in a moment, if it had been suggested, for Mr. Peyton was present throughout the whole trial. Under these circumstances the objection seems to me wholly groundless. Mr. Badlam gave every interpretation to the court under oath; and he had certainly a right to use the knowledge of others to assist his own judgment in any case of doubt, giving his own interpretation finally to the court. If there has been no mistake in the interpretation, what ground can there now be for any just complaint?

The next objection is, that upon the appli-

cation of the counsel for the prisoners, the latter were not allowed to be placed near to the counsel, for the purpose of instructing the counsel in their defence, as they deemed necessary. Now the facts were, that though the usual place for prisoners, in all capital cases, is in the dock, or prisoner's bar, the prisoners in this case were all, for their own accommodation, and that they might hear the testimony, witness the proceedings, and have free intercourse with their counsel, placed within that portion of the bar, which is assigned for the use of counsellors at law, and within a reasonable distance from their counsel, who could constantly have the freest access to them; and to whom the court stated, that every delay of time for this purpose, would be cheerfully given; and it was accordingly given. But the counsel wished to have the prisoners placed in the very front benches of the bar, in places constantly assigned for gentlemen of the bar. The court thought such an indulgence inconvenient and unnecessary; and if it was yielded to in that case, it must form a precedent in all other cases, and that such a departure from the whole course of practice, usually adopted upon such occasions, would, from its nature, become liable to great objection. But the court added, that an interpreter should sit by the prisoners, and punctually state to them the proceedings, and questions and answers; and that they might communicate with their counsel freely, and as often as they wished. And this was accordingly done. Even this objection, such as it is, applied only to a short period of the trial; for when the court removed to another place (the temple), the prisoners were placed as near to their counsel as they well could be. Nor should it be put out of sight, that during this long and protracted trial, every indulgence, as to time and examination, was granted to the prisoners' counsel; that they had the fullest opportunity to communicate in court, and out of court, with the prisoners, upon all the matters in evidence, and to obtain their instructions. And we have not the slightest reason to doubt that such communications, as far as they were deemed useful by the counsel, were most freely and fully used by them. Nay, to this very hour, no suggestion has been made, that any material fact or disclosure was omitted, which could have aided in the defence. Under such circumstances, I can perceive no ground to sustain this objection.

The next cause is, that the court refused to have the order, in which the prisoners were placed at the bar, changed before the introduction of each of the witnesses for the government, who were excluded from the court room, after the first of these witnesses had been examined, and had retired. The court did so refuse; and I am yet to learn, that there is any principle of law or duty, which required them to act otherwise. The

reason why the court did not yield to the request was, that it might otherwise seem, as if the court intended to cast some imputation upon these witnesses, as confederating out of court together to tell the same story, and charge the same persons, sitting in the same order with the crime. But the court said that it was open for the counsel of the prisoners, to make inquiries from each of the witnesses when upon the stand, whether they had had any such communication with the others out of court; or whether they had had any knowledge of the order, in which the prisoners were arranged. To some of the witnesses (if I rightly remember) such questions were put, and they negatived any such communications. Nor is there now any proofs, that any such communications were had, which could have influenced the testimony of these witnesses. The motion itself was new. It was a matter for the exercise of the sound discretion of the court; and there is no proof, that it operated injuriously to any of the prisoners. Without imputing fraud and wilful perjury to these witnesses, I cannot perceive how the objection can be sustained.

The next objection is, that the witnesses for the government, were allowed, with the chart of the Mexican's route on her voyage before them, to be asked the question, whether under the circumstances stated, of the supposed time of starting of both vessels, the Mexican and Panda would or would not be likely to meet at the point marked on the chart. The objection proceeds upon the ground that, under such circumstances, the question became a leading question; and ought not to have been put. My opinion is, that the objection is unfounded in law. The chart of the Mexican was already in the case, and it was proved by the mate that it contained her route on the voyage, and that he had marked that route from day to day, during the voyage on the chart, up to the point where the robbery was committed, and back again to Salem. For the purpose of asking the question, then, it might properly be taken as a supposed fact, that the Mexican was at a particular spot on the day of the robbery, having sailed from Salem on the 29th of August, and the question then to be asked of nautical witnesses, was whether a vessel sailing from Havana, bound to Cape Mount on the coast of Africa, on the 20th or 26th of August, would or would not be likely to meet her at that point. It seems to me, that this was not only a proper question to be asked of the witnesses, but in no just sense a leading question. It was a matter of nautical skill, experience, and opinion, and the examination of the chart was fit to enable the witnesses as well as the jury, with more accuracy and clearness, to examine all the elements which ought to enter into their opinion. The question was but coming directly to that very point, which, however circuitously, must have been aim-

ed at, in the course of the inquiries, before the testimony could have any strong bearing on the case. Wherever the vessels might have met, if they could not have met at this very spot; where the proof stated that the Mexican was at the time of the robbery, the fact could have had no material influence on the case. If the vessels could not have met there, then the cause was clearly for the prisoners. If they could have met there, it would still remain to be shown that they did meet there. The real point, therefore, of the whole inquiry was to ascertain, whether these vessels might or might not under the circumstances, have met at the very point where the Mexican was. It was the true and appropriate question, which the witnesses were called upon to solve in the negative or affirmative, according to their own skill, judgment, and experience in nautical affairs. The form of the question could not lead them, and it could not mislead them. And the question, in this very form, was afterwards repeatedly asked on behalf of the prisoners' counsel of their own witnesses.

The next objection is that the court declared to the jury and delivered it as their opinion, that the prisoners had no right to pray instructions to the jury on particular points, after the delivering of the principal charge. The court did not give any such direction to the jury upon the subject. The court stated to the leading counsel for the prisoners, who was praying instructions at that stage of the cause and proceeding to reason them out at large, that he must be aware that it was wholly irregular, at that stage of the cause, to proceed in this manner. The regular course of practice in this court in all cases of this sort, is to state the points of law on which the counsel rely, and wish the instructions of the court in their argument to the jury, or at least at some time before the charge is given, that the court may have time to examine and consider them. It would otherwise happen, that the court might be surprised into the necessity of expressing opinions, before due time was allowed to deliberate on them. It is understood, that this objection, after the explanations which have passed at the argument, is not now insisted on. .

The next objection is founded upon the supposed refusal of the court, to give an instruction to the jury, that under certain circumstances, at Nazareth, stated in the instructions, the crew of the Panda had a right to resist, to flee, or destroy the Panda, *or to resort to any other means of self-defence, which they might deem expedient. In the actual form and qualified manner, in which this objection is now couched, that "if the jury believed upon the evidence that," &c., (stating certain facts.) I have not the slightest recollection, that the instruction was ever asked of the court. On the contrary, I then understood it to be asked in the manner and form in which it is expressed in the original motion, and not otherwise. And the circumstance that it was so asked, is strongly corroborated by the fact, that it is so stated in the original motion. But if it were otherwise, still I am of opinion that the court have given the instruction, as fully as the prisoners' counsel were entitled to require it, and in a manner quite as favorable to the prisoners. And indeed, the whole merits of this objection have been already considered in the preceding part of this opinion.

These are all the objections which are in the written motions, and which have been so elaborately argued at the bar, excepting those which respect the weight of evidence upon the trial, and the new evidence now offered. I shall now proceed with the consideration of these objections. And, first, it is said that the verdict is manifestly against evidence and the weight of evidence. My opinion is the other way. If the jury believed the evidence (and its credibility was a matter exclusively for their consideration), it appears to me, that their verdict was not contrary to evidence or against the weight of evidence, but coincident with both. And I apply this remark equally to the case of Boyga, Montenegro, Castillo, and Garcia; although certainly, the evidence was not equally strong against each of them.

The other point respects the new evidence now before the court. I lay no particular stress upon the affidavit of Dalrymple (which has been objected to) for two reasons—first, because he might have been produced as a witness on the stand at the trial, by the counsel for the prisoners, as Battis expressly pointed him out at the trial as having been spoken to by him; and, secondly, because I do not think, correctly considered, that any thing contained in Dalrymple's affidavit does impugn what Battis stated at the trial. The affidavit of Alexander Thomas is principally to collateral matters only. The other affidavits are of the prisoners who have been acquitted. They positively swear to certain facts, which, if true, are utterly inconsistent with the testimony and statements of the witnesses for the government. First, they utterly deny that they ever met or robbed the Mexican during the voyage. Secondly, they utterly deny any intention or attempt to blow up the Panda at Nazareth. Upon this last point they are opposed by the direct and strong testimony of Quentin, Domingo, and Silveira, all three of them disinterested witnesses. Upon the first point their testimony is irreconcilable with the strong and direct and disinterested testimony of the officers and crew of the Mexican (seven in number), and especially of those who speak positively to the identity of Ruiz, Boyga, and Delgado, if that testimony is not utterly unworthy of belief, and is not founded in the grossest and most extraordinary mistakes. It is also irreconcilable with the positive testimony of

Domingo and Silveira, as to the confessions of several of the prisoners. And, if Perez is to have any credit, where he is confirmed by other testimony, it is utterly irreconcilable with the whole substance of his testimony. Besides these considerations, it cannot escape observation that these acquitted witnesses stand in a very delicate and peculiar predicament in relation to the case. They were embarked, if the evidence upon the trial is to be credited, and upon which their own acquittal mainly proceeded, on a voyage in the slave trade, a voyage prohibited by the Spanish laws and treaties, and of such a character, that under such circumstances, it cannot but detract somewhat from the confidence which we should otherwise repose in their perfect integrity and credit. To this it should be added, that they were incompetent witnesses at the trial. And I cannot but think it would be most injurious to the general administration of public justice to allow a new trial upon the merits, upon the evidence of persons charged as joint offenders after their acquittal, when they were incompetent witnesses at the time of the trial. The observations of the supreme court of Massachusetts upon this point, in the recent case of Sawyer v. Merrill, 10 Pick. 16, strike me as entitled to very great weight, and I entirely concur in them. Indeed, an acquittal is not always proof of actual innocence; and it is frequently little more than a declaration, that the guilt of the party is not established by the proofs beyond a reasonable doubt. But in a capital case, like the present, it appears to me, that the court ought not, upon general principles, to grant a new trial, unless the fullest credit is given to the new evidence, and the court is of opinion, that it outweighs in strength and clearness and force, the evidence on the other side. In short, my opinion is, that in a capital case a new trial ought not to be granted, if the court possess the power, unless, taking into consideration the new evidence, the verdict in the opinion of the court, ought to be the other way; and that, therefore, injustice has been done to the prisoners. There is much good sense in the remarks of the court upon this subject, in State v. Duestoe, 1 Bay, 377. And looking at the evidence produced at the trial by the government in this case, I cannot escape from the conclusion, that if the court were to grant a new trial upon the affidavits of the acquitted prisoners, it could scarcely be justifiable, except upon the belief that five at least of the government's witnesses were either perjured, or their testimony was grossly and culpably incorrect.—Butman, Reed, Quentin, Domingo, and Silveira; and that the others had rendered themselves incredible in their statements. To such a conclusion I should be slow to arrive under any circumstances, when the witnesses were disinterested and unimpeached in point of general character, and their credit had been fully sustained by the verdict of an impartial jury.

But if I could arrive at such a conclusion in any other case, I could not arrive at it in this case, where the whole stream of evidence comes from persons, who were indicted as confederates in the offence, and who were then incompetent to testify. I cannot feel such confidence in such testimony as to lead me to the conclusion, that all is rank perjury or reckless delusion on the side of the government's witnesses. This ground, therefore, for a new trial, is in my opinion insufficient also to sustain the motion.

I have now gone over all the grounds offered for a new trial, whether they are matters of law or matters of fact, as briefly as I could, though many of them would have furnished topics for a much longer discussion, if the occasion had required it. My decided judgment, upon a deliberate survey of all these matters, is, that the court ought not to grant a new trial, if we possessed the power to grant one. But being of opinion, that we do not possess the power under the circumstances, I am for overruling the motion altogether. I trust that I have a due and a deep sense of the responsibility thrown upon the court upon the present occasion. No person could have desired more anxiously than myself, that I might have been spared from this painful duty. With the private opinions of other men, not sitting in judgment under the solemnity of an oath, or called upon to express opinions upon a judicial survey of the whole evidence (which the learned counsel for the prisoners has thought fit to bring into the case), we have nothing to do. As little have we to do with the appeals made through the press during the pendency of this cause, or with the supposed popular excitements, which have been alluded to at the argument. I trust that this court is incapable of being influenced by any such considerations, or of being betrayed by them into an abandonment of its own proper duty. I trust, that while I shall never be insensible to human life or human sufferings, I shall always possess the firmness to follow out with an unshrinking fidelity the dictates of my own conscience, and the high commands of the law. I may err in my judgment, for I have not the slightest pretension to infallibility; but if I do err it shall not be an error forced upon me by private opinions, promulgated through the press or otherwise. My present judgment I cheerfully submit to the sober consideration of my country. It is my conscientious judgment, for which I am ready to assume the full responsibility belonging to my station, it having been the result of the best exercise of the powers of my understanding.

DAVIS, District Judge I concur with the presiding judge in the disposal of the motions before us, in this very serious case, which has so long engaged the devoted and solicitous attention of the court, counsel, and jury. With the grounds and reasons

of that opinion my own views coincide, excepting in one point, and on that, from its important bearing, as a constitutional question, I consider it a duty to express my opinion. I refer to that part of the argument, which rests the denial of a power, in the courts of the United States, to grant a new trial, on the merits, in a capital case, though at the request of a person convicted, on the 5th article of amendments to the constitution, declaring, that "no person shall be subject, for the same offence, to be twice put in jeopardy of life or limb." The case of a person convicted of a capital offence, put on trial again, would certainly be embraced by the terms of the article; and yet, in my view of the question, it would not present a case within its true intent and meaning. The article, in the amendments to the constitution, corresponding to a rule of the common law, according to the prevailing spirit and character of those amendments generally, was doubtless intended for the security and benefit of the individual. As such it may be waived and relinquished. That the request of a prisoner for a new trial, affording a chance of escape from death to which a previous conviction would assign him, should be rejected, from adherence to the letter of the rule, that his life would be again in jeopardy, would present an incongruity not readily to be admitted. It is true, that according to approved authorities, the plea of autre fois convict depends on the same principle as the plea of autre fois acquit, that no man ought to be twice brought in danger of his life, for one and the same cause. Bl. Comm. bk. 4, c. 26; 2 Hawk. P. C. 377. The doctrine establishes a right in the prisoner to resort to that defence, if it be attempted or moved, against his will, to subject him to a second trial. The case of a verdict of conviction set aside, at the request of the prisoner, is not suggested in those authorities, and would stand, in my opinion, on very different ground. The previous conviction would not, I apprehend, under such circumstances, be considered as a sufficient bar to a second trial. The concise manner in which many general maxims of the law are expressed, like general rules on other topics, admits or requires, in their application, distinctions, exceptions, and qualifications, all just, reasonable, and, in some instances, indispensable, not expressed in their terms. We have an instructive exemplification of this in an early case, in the supreme court of the United States, in which the meaning of the prohibition, in the constitution, of ex post facto laws, came in question. "I do not consider," said Mr. Justice Chase, "any law as ex post facto, that nullifies the rigor of the criminal law, but only those that create or aggravate the crime, or increase the punishment, or change the rules of evidence for the purpose of conviction." 3 Dall. 391. The benign spirit, ever pervading our law,

which dictated that distinction, may, as appears to me, have a proper influence and application, in reference to the rule of law under consideration, and in other instances of analogous character. By the old common law, observes Sir W. Blackstone, the accessory could not be arraigned till the principal was attainted, "unless he choose it, for he might waive the benefit of the law." Comm. bk. 4, c. 25 And in People v. McKay, 18 Johns. 212, a case of murder, Chief Justice Spencer remarks: "We know of no case which contains the doctrine, that where a new trial is awarded, at the prayer and in favor of a person that has been found guilty, he shall not be subject to another trial." [4] On the whole, I am not convinced that the article of the constitution under consideration, would, in just and reasonable construction, be a bar to a new trial granted at the request of a person capitally convicted. I am not aware that there is any direct decision on this point. It is an open question. If a second trial in capital cases, be inadmissible, under the article, though at the request of the prisoner, then no legislative enactment can vary the law on the subject, without an amendment of the constitution. The question may thus become highly important, though the article should be binding only in the courts of the United States; still more so if, conformably to Chief Justice Spencer's opinion, it extend to decisions in the state courts. A decision on this point, however, is not essential, as this case stands, to a determination on the motion for a new trial, in which, notwithstanding a difference in opinion in reference to the constitutional question, we come to the same result. The discretion of the court on the subject of new trials is not unlimited. They are allowable "for reasons for which new trials have usually been granted in the courts of law," and with this statute direction, we are to bear in mind the 7th article of amendments to the constitution—"No fact tried by a jury, shall be otherwise re-examined, in any court of the United States, than according to the rules of the common law." Having reference to such directories, should the motion for a new trial in this case be allowed, there would, in my opinion, be a departure from the usages of courts

<hr>

[4] McKay was convicted on an indictment for murder. Judgment was arrested. on motion in his behalf, for defect in the issuing and return of the venire. Agreeably to repeated decisions, there may be a new trial, in all cases. where there has been a mis-trial or mere irregularity in the former trial. vitiating or vacating the proceedings. But the question made by the counsel in that case, whether the arrest of judgment did not entitle the prisoner to be discharged, does not appear to have been met by the court on that ground. "It will be observed," says the chief justice, "that the judgment is arrested on the motion of the prisoner, an act done at the request, and for the benefit of the prisoner, we are clearly of opinion cannot exonerate him from another trial."

of law, and from the principles manifested by the great current of decisions in cases of this description.

I agree with the presiding judge, in the views which he has expressed on the motion in arrest of judgment, as well as with those on the motion for a new trial, excepting in the instance which I have specified, and in the result, that the motions be overruled.

The decision of the court was then interpreted to the prisoners.

Mr. Child then begged leave to file a bill of exceptions, with a view of carrying the case before the supreme court, and urged that the case involved several important points of law.

THE COURT replied, that they must proceed to pass the sentence; but the motion of Mr. Child could be taken into consideration, and would be acted upon hereafter.

Mr. Child then earnestly pressed upon the court to respite the execution, to give time to send to Havana and England, to clear up this dark and mysterious affair.

THE COURT said it should be allowed, and if the time proved not long enough, the executive clemency would no doubt extend it, by a reprieve.

STORY, Circuit Justice, after hearing the several protests of innocence from the prisoners, on motion of Dunlap, Dist. Atty., proceeded to pronounce the sentence of the court, as follows:

Prisoners at the Bar: The motions made by your counsel for a new trial and in arrest of judgment having been overruled by the court, and all other matters disposed of, it is now my painful duty to pronounce the sentence of the law upon each of you, for the crime whereof you severally stand convicted. I shall do this in as brief terms as possible, being conscious of the difficulty of addressing you through the medium of an interpreter only. The sentence is, that you, and each of you, for the crime whereof you severally stand convicted, be deemed, taken, and adjudged to be pirates and felons, and that you, and each of you, be therefore severally hanged by the neck until you are severally dead. That the marshal of this district, or his deputy, do, on peril of what may fall thereon, cause execution to be done in the premises upon each of you on the 11th day of March next ensuing, between the hours of 9 o'clock in the forenoon and 12 o'clock at noon, of the same day, and that you now be taken from hence to the jail in Boston, in this district, from whence you came, there, or in some other safe and convenient jail within the same district, to be closely kept until the day of execution; and from thence, on the day of execution appointed, as aforesaid, you are severally to be taken to the place of execution, there to be hanged, as aforesaid, until you are severally dead. I earnestly recommend to each of you to employ the intermediate period in sober reflections upon your past life and conduct, and by prayer and penitence, and religious exercise, to seek the favor and forgiveness of Almighty God for any sins and crimes which you may have committed; and for this purpose I earnestly recommend to you, and to each of you, to seek the aid and assistance of the ministers of our holy religion of the denomination of Christians to which you severally belong. And in bidding you, so far as I can presume to know, an eternal farewell, I offer up my earnest prayers that Almighty God may in his infinite goodness have mercy on your souls.

The above sentence was then interpreted to the prisoners by a sworn interpreter.

David L. Child, of counsel for the prisoners, now (on the 23d day of December), in pursuance of a suggestion made by him a week before, and immediately after the opinion of the court overruling the motion for a new trial and in arrest of judgment, moved to file a bill of exceptions, and requested the court to sign the same, if found true. THE COURT said that the bill might be filed, if the counsel wished it, on the record; but it could not be allowed by the court. And it was accordingly filed, but without having been read, the counsel not wishing to read it, after the opinion of the court was stated.

STORY, Circuit Justice. This being the case of a capital conviction, when the counsel for the prisoners, a week ago, suggested an intention to offer a bill of exceptions, the court then stated, that it would be expected that he should show some authority to justify the court in allowing a bill of exceptions in a capital case. It is now admitted, that the counsel have no authority to cite, which affirms the power in this court. And it is believed by the court, that none exists. We have, however, in the interval between the suggestion and the present time, deliberately examined the point, and are fully satisfied, that no such power exists in this court; and therefore it has not been deemed necessary to examine the correctness of the exceptions stated in the bill, which has been proffered.

In the first place, no power is given by statute to this court, to allow any bill of exceptions in any criminal case whatsoever; and it seems impossible to infer it by implication from any provisions in the laws of the United States. The circuit courts have final jurisdiction of all cases of crimes; and no writ of error or appeal lies to the supreme court in any such cases. Now, the sole object of a bill of exceptions is to present the matter for the revision of some superior court; and if no revision can be had, then the authority to allow a bill of exceptions would be utterly nugatory. The only mode contemplated by the laws of the United States to revise the opinions of the judges of the circuit courts in criminal cases is, when the

judges are divided in opinion at the trial; and then the point of division may be certified to the supreme court for a final decision under the judicial act of 1802 (chapter 31, § 6). There was no such division upon the present trial. If resort be had to the common law to aid us in examining this point, it will be found, that no bill of exceptions lies, in capital cases, even since the statute of Westminster II. (13 Edw. I. St. 1) c. 31, which first gave a bill of exceptions. And the better opinion certainly now is, that that statute is confined to civil proceedings, and does not extend to any criminal proceedings whatsoever. As the authorities are not all agreed on this point in cases of mere misdemeanors, it is not necessary here to decide it in regard to the latter. But in capital cases, in cases of treason and felony, it is universally agreed in England, that no bill of exceptions lies. This was solemnly settled in the case of Rex v. Vane, which was a case of high treason. It is reported in 1 Lev. 68, and in various other Reports. See Buller, N. P. 316; 1 Chit. Cr. Law (English Ed.) 622; Willes, 535, and note (b), which cites 2 Inst. 424, and Saville, 2. The very point was made, and according to Leving's Reports, it was held by the court, "that a bill of exceptions does not lie in criminal cases, but only in actions between party and party." The application was accordingly overruled, and Sir H. Vane was executed on Tower Hill. The same doctrine is laid down in Hawkins (2 Hawk. P. C. c. 46, § 198), who says: "It hath been adjudged, that no bill of exceptions is grantable on an indictment of treason or felony, the statute of Westminster, etc., having never been thought to extend to any such case." Lord Hardwicke, in Rex v. Inhabitants of Preston, Cas. t. Hardw. 251, 2 Strange, 1040, said: "Nor was it ever pretended, that in capital cases a bill of exceptions lay. In Vane's Case, it is not said to lie in any criminal case. But that point is not settled, and therefore I will give no opinion as to that." In Bacon's Abridgment (1 Bac. Abr. "Bill of Exceptions") it is said: "It is agreed that no bill of exceptions is to be allowed in treason or felony." And the same doctrine will be found in other elementary writers (see Buller, N. P. 316; 1 Chit. Cr. Law, English Ed., 622; Willes, 535, and note b, which cites 2 Inst. 424, and Saville, 2), and no authority to the contrary can be found. In People v. Holbrook, 13 Johns. 90, S. P. 6 Cow. 565, it was held by the supreme court of New York that no bill of exceptions lies in any criminal case; and this doctrine is not only supported by Vane's Case, but by Rex v. Barkstead, 1 Kreb. 244; T. Raym. 468; 1 Sid. 85.

There is then no pretence to say, that in capital cases this court can draw in aid the doctrines of the common law, as administered in England, to confer such a power. It is not implied from any statute authority. It is not implied in any reasoning at the common law, or under the statute of Westminster. We are therefore of opinion, that this court possesses no such authority; and we dare not assume what has never been confided to the court.

If this objection were not, as we think it is, conclusive, we think, that the bill of exceptions ought not now to be allowed, upon another and a distinct ground. It was not made or tendered at the trial, nor until a long time afterwards, and after a motion made and argued for a new trial and in arrest of judgment, and the opinion of the court deliberately had thereon. Under such circumstances, where the verdict was satisfactory, and the court feel no doubt about the law, it is our opinion, that the bill of exceptions ought not to be allowed. It is not within the general principles, which regulate rights of this sort. See 1 Salk. 288; 8 Mod. 222; 2 Tidd. Prac. 788. The government has its rights, as well as the prisoners.

Bill of exceptions not allowed.